OPINION *Page 2 
¶ {1} Defendants-appellants ABN AMRO Mortgage Group, Inc., Donald F. Bucci and Rosemarie Bucci appeal the decision of the Mahoning County Common Pleas Court finding in favor of plaintiff-appellee Eastern Savings Bank. Appellants urge that the court erred by subordinating ABN's mortgage to appellee's claim under the doctrine of lis pendens. Appellants also argue that the court erred in finding a fraudulent transfer to and a lack of good faith by Rosemarie and Donald F. Bucci. Lastly, appellants claim that the court erred in admitting hearsay in the form of an appraisal ordered by ESB. For the following reasons, the judgment of the trial court is affirmed.
 STATEMENT OF THE CASE ¶ {2} Donald B. Bucci and his wife, Diane, (who have not filed an appeal in this case) owned realty at 424 and 455 S. Main Street in Poland, Ohio. They lived at 424 and rented out 455. On October 30, 2000, in order to avoid a threatened foreclosure by National City Bank, they successfully obtained a $390,000 loan from Eastern Savings Bank secured by a mortgage on both properties. They made their first two monthly payments late and then stopped making payments altogether.
¶ {3} On February 28, 2001, Attorney Beck prepared deeds for them to quitclaim the properties to Donald F. Bucci, who is Donald B.'s father. Donald F. testified that he paid nothing for the deeds and was unaware that the properties had even been transferred to him at that time. ESB was also unaware of this transfer.
¶ {4} On June 4, 2001, ESB filed a foreclosure action with regards to both 424 and 455 against Donald B. and Diane, who immediately filed for bankruptcy. This stayed the foreclosure action until the bankruptcy was dismissed in December 2002. At such time, a sheriff's sale was ordered for February 18, 2003.
¶ {5} On February 13, 2003, Donald F., through Attorney Kish, filed a motion to intervene in the foreclosure action and to stay the sheriff's sale based upon his ownership of the properties. Upon ESB's argument that the transfers must be set aside, Attorney Kish then negotiated with ESB for permission to enter a private sale of the 424 property. This sale took place in June 2003, and ESB was paid all net proceeds totaling $433,000. ESB considered this sufficient to release the mortgage on *Page 3 
the 424 property. There was a further expectation that the 455 property would sell in July from which ESB would receive the remaining balance totaling over $115,000.
¶ {6} The anticipated sale of 455 did not occur, and after a status hearing with the court, Donald F. and Rosemarie transferred 455 back to Donald B. and Diane through a July 22, 2003 deed prepared by Attorney Beck. Although no money had ever been transferred regarding the property and although Donald B. admitted that the transfer to his father was performed in order to avoid creditors, Donald B. and Diane recorded a $46,000 mortgage on the property in favor of (but unbeknownst to) Donald F. and Rosemarie.
¶ {7} On August 8, 2003, Donald F. was dismissed as an unnecessary party due to the consensual sale of 424 and his transfer of 455 back to Donald B. The court then ordered foreclosure on 455, and a sheriff's sale was scheduled for January 5, 2004.
¶ {8} In response to the complaints of the new owners of 424 about a clouded title, ESB intended to release the mortgage on 424. However, in a release of mortgage recorded on November 7, 2003, ESB mistakenly released 455 instead of 424.
¶ {9} Just prior to the scheduled sheriff's sale of 455 in January 2004, Donald B. and Diane filed bankruptcy again with the assistance of Attorney Beck. ESB filed an objection in the action. During this time, Attorney Beck negotiated with ESB for a private sale of 455 to be completed prior to May 26, 2004 and to net $75,000 for ESB. During these negotiations, ESB voiced that the buyer could not be an insider, a term with which Attorney Beck took issue in a February 2004 letter.
¶ {10} Within a week of their April 2004 bankruptcy dismissal, Donald B. and Diane executed a May 3, 2004 memorandum of trust with Attorney Beck as trustee for the purpose of the trustee taking title to 455 until sale. At the same time, they quitclaimed 455 to this trustee. On May 27, 2007, the trustee transferred 455 through a general warranty deed to Donald F. and Rosemarie. The purchase price was said to be $75,000. Donald F. took out a $38,000 mortgage from ABN in order to fund the purchase ($8,000 went to costs and the like). Donald B. and Diane received a check for $30,000, and the remaining $45,000 was said to be forgiveness for past loans. At trial, Donald F. identified checks from 1988 through 1993, said to represent $60,000 in *Page 4 
loans to his son. The mortgage from July 22, 2003 (which Donald F. never even knew about) was released apparently as proof of the claimed loan forgiveness.
¶ {11} Notably, ESB received nothing from the sale. Attorney Beck and Donald B. testified that since ESB had recorded the release of 455 in November 2003, they were unaware that ESB was still claiming it was owed money regarding 455, notwithstanding the negotiations that had occurred thereafter. When preparations for another scheduled sheriff's sale were interrupted by a telephone call claiming new owners, ESB realized that Donald B. and Diane had transferred the property to Donald F. (again) and Rosemarie and that a release of 455 had been mistakenly recorded in November 2003.
¶ {12} On January 18, 2005, ESB filed and recorded an Affidavit of Facts Relating to Title, asserting that the 455 release was a mistake and claiming a continued lien on 455. ESB then amended its complaint in the foreclosure action to add Donald F., Rosemarie and ABN as defendants. They added claims for fraudulent conveyance and superior title through the doctrine of lis pendens (translated "pending litigation"). Another two bankruptcy filings then further disrupted the proceedings.
¶ {13} Finally, a bench trial proceeded before a magistrate on April 9, 2007. The trial revolved around the application of the Uniform Fraudulent Transfer Act. Thereafter, the parties filed proposed findings of fact and conclusions of law.
¶ {14} On August 24, 2007, the magistrate found in favor of ESB. The magistrate stated that ESB's burden was to establish the fraudulent intent of the debtor, not of the transferee. The magistrate found eight of the eleven badges of fraud set forth in R.C. 1336.04(B) applicable. Specifically, in determining that the debtor (Donald B.) had actual intent under R.C. 1336.04(A), the magistrate held:
¶ {15} "(1) the transfer was to an insider, first to Beck then to the father of the debtor;
¶ {16} "(2) the debtor retained possession and control after the transfer and is currently still residing in the property;
¶ {17} "(3) the transaction was not disclosed to ESB, and Beck and Donald B. knew ESB was still claiming a lien and the foreclosure action was still pending;
¶ {18} "(4) the transaction occurred while the foreclosure action was pending;
¶ {19} "(5) the 455 property was the only remaining asset of Donald B., and he filed for Chapter 7 bankruptcy in October 2005; *Page 5 
 ¶ {20} "(6) the $30,000 received by the debtor was less than reasonable equivalent value as all appraisals set the actual value considerably above this amount;
¶ {21} "(7) bankruptcy shows Donald B. was insolvent shortly after the transfer; and
¶ {22} "(8) transfer of property to Beck then to insider."
¶ {23} The magistrate opined that Donald F. could not use the bona fide purchaser defense as the sale was not a good faith transaction. Regarding a lack of good faith in the purchase, the court noted how Donald F. let his son perform all of the details including applying for the ABN loan and how he signed whatever documents his son asked him to sign. The magistrate noted that Donald F. claimed no knowledge of the foreclosure action and concluded that Donald F. had both actual knowledge and was also charged with knowledge through Attorney Kish who negotiated on his behalf, pointing out that a principal is charged with the knowledge of his agent.
¶ {24} The magistrate additionally found a fraudulent transfer under R.C. 1336.05, which contains special considerations for those creditors with pre-existing claims like ESB. Specifically, the magistrate found that the transfer was to an insider for an alleged antecedent debt while Donald B. was insolvent and that Donald F. had knowledge of the debt to ESB and of the pending foreclosure. Besides the entitlement to have the transfers avoided under the UFTA, the magistrate found common law remedies applicable here such as fraud.
¶ {25} As to ABN, the magistrate opined that ABN was not a bona fide purchaser because it had actual knowledge of ESB's claim, pointing to Donald F.'s mortgage application listing a first mortgage on the property through "Eastern" for $30,000. The magistrate also stated that ABN's mortgage is subject to ESB's claim under the doctrine of lis pendens codified in R.C. 2703.26, which states that a pending action provides third parties notice of the interest claimed therein and that no interest can be acquired by third persons in the subject of the action as against the plaintiff's title. The magistrate held that lis pendens is a doctrine independent of the recording statutes and that the mistaken release of 455 does not affect lis pendens notice.
¶ {26} The magistrate concluded that ESB is entitled to avoid the transfer of the 455 property, to an order of foreclosure and to have the property sold to satisfy the amount currently owed on the note. The magistrate further concluded that ABN has a mortgage on 455 but that the mortgage is subordinate to ESB's mortgage. *Page 6 
 ¶ {27} Timely objections were filed by Donald F., Rosemarie and ABN. On January 7, 2008, the trial court adopted the magistrate's decision, repeated the findings of fact and conclusions of law set forth therein and issued judgment for ESB. Donald F., Rosemarie and ABN (hereinafter appellants) filed the within appeal.
 STANDARD OF REVIEW ¶ {28} Appellants set forth some pure legal issues, an evidentiary issue, and various factual issues. The legal issues shall be reviewed de novo. See Ohio Bell Tel. Co. v. Pub. Util. Comm. (1992),64 Ohio St.3d 145, 147.
¶ {29} Since decisions regarding the admissibility of evidence are within the broad discretion of the trial court, the evidentiary issue shall be reviewed for an abuse of discretion. Beard v. Meridia HuronHosp., 106 Ohio St.3d 237, 2005-Ohio-4787, ¶ 20. An abuse of discretion results when a decision is unreasonable, arbitrary or unconscionable.Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219. Even in the face of an abuse of discretion, however, such evidentiary ruling is not reversible unless it affected appellant's substantial rights or was inconsistent with substantial justice. Beard, 106 Ohio St.3d 237
at ¶ 20.
¶ {30} Finally, the factual issues shall be reviewed to determine whether the trial court's decision is contrary to the manifest weight of the evidence. Judgments supported by some competent, credible evidence will not be reversed on appeal as being against the manifest weight of the evidence. State v. Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, ¶ 24. When addressing a trial court's decision on weight and credibility, this reviewing court is guided by the presumption that the findings of the trial court are correct. Id. One rationale for this presumption is that the trial court is in the best position to view witnesses and observe their demeanor, voice inflection, and gestures. Id. We do not second guess credibility decisions or rational inferences drawn. As the Supreme Court recently explained, the standard for evaluating the weight of the evidence in a civil case is even more deferential to the fact-finder than in a criminal case. Id. at ¶ 26. Thus, criminal appeals allow reweighing by the appellate court, but civil appeals require affirmance of judgments supported by some competent, credible evidence with no appellate reweighing of the evidence permitted. Id.
¶ {31} We now turn to appellants' five assignments of error. As we are addressing the first assignment of error with the related third and fourth assignments, *Page 7 
we shall begin with assignment of error number two dealing with the doctrine of lis pendens.
 ASSIGNMENT OF ERROR NUMBER TWO ¶ {32} Appellants' second assignment of error contends:
¶ {33} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FOUND THAT ABN AMRO'S MORTGAGE WAS SUBORDINATE TO THE EQUITABLE LIEN CLAIM OF ESB."
¶ {34} Appellants contest the two alternate reasons used by the court for subordinating ABN's recorded mortgage to that of ESB's released mortgage. First, ABN takes issue with the court's finding that the mortgage application of Donald F. that was used by ABN established that ABN had actual knowledge of ESB's superior claim. ABN states that it has no obligations to investigate all liabilities listed on the application. ABN also argues there was no evidence that the word "Eastern" on the mortgage application referred to appellee, Eastern Savings Bank.
¶ {35} In the housing expense information section, the application shows an existing first mortgage of $500 per month, plus $140 in real estate taxes and $33 in insurance. In the liabilities section, Eastern is listed as a liability with an unpaid balance of $30,000, a present $500 monthly payment and three hundred months left to pay. In the schedule of real estate owned, 455 South Main Street (the property at issue) is listed as having a present market value of $178,000 and a mortgage for $30,000 with a $500 monthly payment, plus $170 in taxes and insurance. (For purposes of comparison and to show there is a distinction, we note that Donald F.'s actual residence was also listed with a separate $5,300 shown as being an outstanding mortgage/home equity loan.) Next, under the details of the transaction section, the purpose of the application is said to be for refinance and to pay off debts of $30,000. The application established that the refinance would lower the monthly payment from $500 to $237. Finally, the underwriting summary contained an internal reminder to seek a payoff letter from Eastern to show a $30,000 payoff amount.
¶ {36} Contrary to appellants' suggestion, Eastern was not merely listed as some general creditor. Rather, it was specifically disclosed to hold a first mortgage on the 455 property. Also contrary to appellants' contention, under all of the particular facts and circumstances existing in this case, a rational fact-finder could reasonably infer that the reference to Eastern in ABN's mortgage application means Eastern *Page 8 
Savings Bank. ESB presented competent, credible evidence that allowed this conclusion to be made. Besides the same substantive name and the fact that ESB in fact was in the process of foreclosing on its first mortgage on 455 at the time of the application, Donald F. testified that he knew of no other Eastern other than the one suing him now. ABN did not present testimony from any representative to counter the conclusion which could rationally be drawn from the evidence presented and/or to establish for instance that they discovered a lien on 455 owned by some other creditor named "Eastern" or that a payoff letter was received from some other creditor named "Eastern." The trial court's conclusion that ABN had actual knowledge of ESB's priority mortgage claim was not contrary to the manifest weight of the evidence.
¶ {37} The second argument presented under this assignment of error is that the court erred in finding ABN's mortgage subordinate to the released mortgage of ABN under the doctrine of lis pendens. Specifically, appellants argue that the court erred in holding that the doctrine of lis pendens operates independently of the recording statutes and in holding that notice imputed under lis pendens is not affected by ESB's mistakenly recorded release. Appellants cite cases stating that a mistakenly canceled mortgage effectively cancels the mortgage as to subsequent bona fide purchases. See, e.g., Ramsey v. Jones (1885),41 Ohio St. 685, 687 (holding that a recorded release of a mortgage and accompanying failure to record a substitute mortgage clothed the debtor with absolute ownership and provided binding notice to subsequent purchases and mortgagees that the debtor paid off the mortgage for purposes of determining lien priority). Appellants also state that a released mortgage cannot be foreclosed upon. Clark v. Owensville Bldg. Loan Co. (1933), 46 Ohio App. 301 (dealing with actions at law versus actions at equity and remanding for new trial). From this law, appellants conclude that a plaintiff releases any lis pendens right under the statute when a release is recorded because lis pendens only protects a claim to title but a recorded release cancels that claim to title.
¶ {38} Appellee counters that an inadvertent release does not affect the doctrine of lis pendens as it is a separate and distinct doctrine from that codified by the recording statutes. They agree with theRamsey holding but distinguish it since it did not involve the lis pendens doctrine as no foreclosure lien or other action was pending in that case. Appellee concludes that lis pendens "notice" of an equitable claim provides the plaintiff in the pending litigation with priority over the interest acquired *Page 9 
during the pending litigation if the three basic elements are satisfied. Appellee also points out that a reasonable purchaser would have discovered the common pleas court action for foreclosure in the title search and concludes that this can be used to show the lack of bona fide purchaser status. On this topic, Attorney Beck admitted that a typical title search would have discovered the pending foreclosure action.
¶ {39} The Ohio Supreme Court has always considered lis pendens to be a long-standing, sound and wholesome doctrine based on the public policy need to maintain the status quo of interests in property involved in litigation (including those of third parties) until completion of the pending action. Cook v. Moser (1923), 108 Ohio St. 30, syllabus, 39. TheCook Court explained:
¶ {40} "The general rule is that one not a party to a suit is not affected by the judgment. The exception is that one who acquires an interest in property which is at that time involved in litigation in a court having jurisdiction of the subject-matter and of the person of the one from whom the interests are acquired, from a party to the proceeding, takes subject to the judgment or decree, and is as conclusively bound by the result of the litigation as if he had been a party thereto from the outset. This is so irrespective of whether he has been made a party to the proceeding, or had actual notice of the pendency of the proceeding, and even where there was no possibility of his having had notice of the pendency of the litigation. It is immaterial that a purchaser was a bona fide purchaser and for a valuable consideration. While there is no doubt whether lis pendens has the effect of constructive notice, it is almost universally held that strictly speaking the doctrine of lis pendens is not founded upon notice but upon reasons of public policy founded upon necessity. For practical purposes, however, it is immaterial whether the doctrine of lis pendens be considered as based on constructive notice or on public policy. It has been said that it is essential to the existence of a valid and effective lis pendens that three elements be present: (1) The property must be of a character to be subject to the rule; (2) the court must have jurisdiction both of the person and the res; and (3) the property or res involved must be sufficiently described in the pleadings. [4] It may be added that the litigation must be about some specific thing that must be necessarily affected by the termination of the suit." Id. at 36-37.
¶ {41} The codified doctrine of lis pendens provides:
¶ {42} "When summons has been served or publication made, the action is pending so as to charge a third person with notice of its pendency. While pending, no *Page 10 
interest can be acquired by third persons in the subject of the action, as against the plaintiff's title." R.C. 2703.26.
¶ {43} As appellee points out, the elements of lis pendens are present here: the property is of the character subject to the rule; the court has jurisdiction over the person and the realty; the property was sufficiently described in the complaint (which included an address and a legal description); and, the foreclosure litigation is about a specific thing that is necessarily affected by the termination of the suit as the realty is the very essence of the suit. See Cook, 108 Ohio St. at 37. In any event, appellants do not actually take issue with the application of these elements. Rather, appellants merely attempt to argue that the statutory phrase "as against the plaintiff's title" means that the plaintiff must have some kind of recorded claim to title at the time of the action and that ESB would not have such title after the mortgage was released.
¶ {44} However, nothing in the lis pendens statute requires compliance with the recording statutes. In fact, under appellants' theory, lis pendens would essentially be a nullity in cases where recording is available. That is, appellants' position means that if the mortgage had not been released, then there would be no need to resort to lis pendens, but if the mortgage is accidentally unrecorded or mistakenly released, then lis pendens is unavailable.[1]
 ¶ {45} We note that a Second District case relied upon by appellants is actually more supportive of appellees' position. ABN AMRO Mort. Grp.,Inc. v. Jackson, 159 Ohio App.3d 551, 2005-Ohio-297. In that case, appellant ABN was itself a party. (As such, we shall refer to the case as Jackson.) In fact, ABN successfully argued against the position theynow assert and instead relied upon the argument that a mistaken failure to record (when they were the one making the mistake) does not affect lis pendens.
¶ {46} Appellants currently cite the Jackson case for the proposition that an unrecorded mortgage is valid between the mortgagor and the mortgagee but to all others it takes effect from the time it is left for record. See id. at ¶ 16. The Jackson court did make this general statement after noting that ABN's opponent argued that the doctrine of lis pendens did not apply based on ABN's failure to record its mortgage *Page 11 
as required by statute. See id., citing R.C. 5301.23 (which states, "All properly executed mortgages shall be recorded in the office of the county recorder of the county in which the mortgaged premises are situated and shall take effect at the time they are delivered to the recorder for record.").
¶ {47} The Jackson court concluded, however, that lis pendens applied regardless of the failures under the recording statutes. See id. at ¶ 16-19 (reviewing the law on recording and the lis pendens doctrine). The court then proceeded to address an argument that ABN's description in its foreclosure complaint was not sufficient to satisfy that element of lis pendens. Id. at ¶ 20-23. As such, ABN's cite to Jackson is not helpful to its position.
¶ {48} In conclusion, lis pendens does not require a recorded claim to title. See Renner v. Johnson (1965), 2 Ohio St.2d 195, 198-199 (actual notice from recording or constructive notice from pending lawsuit bars even subsequent bona fide purchaser from acquiring superior rights). See, also, Stern v. Stern (Dec. 21, 1999), 7th Dist. No. 97JE77, fn.2 (dealing with actual notice but noting that in limited circumstances such as where R.C. 2703.26 applies, constructive notice precludes a purchaser from taking free of an unrecorded land encumbrance). It can thus be seen that lis pendens is a separate notice device from recording. See Renner, 2 Ohio St. at 199.
¶ {49} The case law on lis pendens and the doctrine's purposes and elements are satisfied here. The case law appellant cites about unrecorded or mistakenly released mortgages is inapplicable where those cases did not also involve a pending foreclosure action on the property. Ohio law places a burden on the purchaser/mortgagee to determine if there are actions pending concerning the very realty which they seek to buy/finance. As such, the court did not err in finding the doctrine of lis pendens applied to give ESB's claim priority over that of ABN.
¶ {50} As appellee urged below, this doctrine also provides ESB with priority over the claims of Donald F. and Rosemarie Bucci to the property as they also acquired the property during the litigation. Still, the trial court proceeded to find a fraudulent transfer to Donald F. and Rosemarie without noting that lis pendens would apply to them as well. In case there is some perceived procedural advantage to having the conveyance wholly set aside as fraudulent (over application of lis pendens which prioritizes claims) and as an alternative reason for supporting the trial court's *Page 12 
judgment, we continue to address whether the transfer to Donald F. and Rosemarie Bucci was avoidable under the UFTA.
 ASSIGNMENTS OF ERROR NUMBER ONE, THREE AND FOUR ¶ {51} Appellants' assignments dealing with the nature of the transfer urge:
¶ {52} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO FIND THAT ROSEMARIE WAS A BONA FIDE TRANSFEREE OF THE PROPERTY."
¶ {53} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT CONCLUDED THAT DONALD F. WAS NOT A BONA FIDE TRANSFEREE OF THE PROPERTY."
¶ {54} "THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT CONCLUDED THAT THE TRANSFER TO DONALD F. WAS FRAUDULENT."
¶ {55} The Uniform Fraudulent Transfer Act (UFTA) allows creditors to avoid a transfer to the extent necessary to satisfy that creditor's claim upon the establishment of certain statutory factors. See R.C. 1336.07(A)(1), citing R.C. 1336.04 and 1336.05. The UFTA is complex and requires many factual decisions to be made. Victory White Metal Co. v.N.P. Motel Syst., Inc., 7th Dist. No. 04MA245, 2005-Ohio-2706, ¶ 35. It provides in pertinent part that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay or defraud any creditor of the debtor. R.C. 1336.04(A)(1). In determining actual intent, the fact-finder should consider all relevant factors, including the following non-exhaustive list:
¶ {56} "(1) Whether the transfer or obligation was to an insider;
¶ {57} "(2) Whether the debtor retained possession or control of the property transferred after the transfer;
¶ {58} "(3) Whether the transfer or obligation was disclosed or concealed;
¶ {59} "(4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
¶ {60} "(5) Whether the transfer was of substantially all of the assets of the debtor;
¶ {61} "(6) Whether the debtor absconded;
 ¶ {62} "(7) Whether the debtor removed or concealed assets; *Page 13 
 ¶ {63} "(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
¶ {64} "(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
¶ {65} "(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;
¶ {66} "(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor." R.C. 1336.04(B).
¶ {67} These factors are often called the badges of fraud. SeeVictory White, 7th Dist. No. 04MA245 at ¶ 28. A debtor's actual intent to hinder, delay or defraud can thus be inferred after weighing the factors. Here, the court found eight badges existing: numbers 1-5, 8-9 and 11. Even if the existence of some of these factors is questionable, enough evidence exists on other factors to show the debtor's actual intent here.
¶ {68} First, the transfer was to an insider. See R.C. 1336.04(B)(1). Appellants dispute this based upon the debtor's transfer to Attorney Beck prior to the transfer to the debtor's father. However, Attorney Beck was transferred the property merely as a trustee, and he sold the property as a trustee. The debtor was the trust's creator and beneficiary, and the trust was revocable by him. Attorney Beck indisputably paid nothing for the transfer and only had authority to hold the property and to sell it. In fact, the testimony allowed the conclusion to be drawn that the specific purpose of the trust was for Donald B. to sell the foreclosed upon property to his parents so that he could continue to live in the property and to avoid allegations of an insider sale by using the trust vehicle to sign the deed. Thus, the transfer from the trust of Donald B. could be considered a transfer by the debtor as it was done on his behalf and per his instructions, and it was to his parents, who are his insiders. See R.C. 1336.01 (G)(1)(a) (relative of debtor).
¶ {69} Moreover, the trust could be considered to have been for the benefit of both Donald B. and his parents, which would put them on the same level as a first transferee. See R.C. 1336.08(B)(1)(a). Regardless of the trust as debtor theory or straw trust theory, the transfer to Attorney Beck as trustee of the debtor's newly *Page 14 
created trust can itself be considered a transfer to an insider. For starters, the list of insiders is not exhaustive. The statute states, "Insider includes" rather than "[Insider] means" as do other statutory definitions. See, e.g., R.C. 1336.01(G). Thus, your attorney, who is acting on your commands and on your behalf and who is acting as trustee of a trust you created for yourself as beneficiary, can be considered an insider under a non-exhaustive list. Additionally, Attorney Beck can be found to fit one of the specifically listed examples of an insider. See R.C. 1336.01(G)(5) (managing agent of the debtor). See, also, R.C. 1336.01(G)(4) (affiliate as insider); 1336.01(A)(4) (affiliate is one who operates business of debtor under an agreement or controls substantially all of the debtor's assets). Accordingly, the trial court could reasonably find the first badge of fraud to exist.
¶ {70} Second, the debtor retained possession or control of the property transferred after the transfer. See R.C. 1336.04(B)(2). In fact, he retained both possession and control. That is, Donald B. had a power of attorney allowing him to sell or finance any realty owned by his parents in the county. Additionally, he never moved out of 455 after the sale to his parents. He made an oral agreement with his father to pay the ABN mortgage payments. He also claimed that the $30,000 he received from his parents for the sale of the property to them was spent by him on renovations to their property. As such, the second badge of fraud is clearly established.
¶ {71} Third, many actions were taken by both ESB and Donald B.after the November 2003 mistakenly recorded release, which would lead a reasonable person to believe that the release of the recorded lien was not a release of ESB's claim to breach of contract and claim to the proceeds of the house. We reiterate here that Donald B. filed bankruptcy in order to stop the January 2004 sheriff's sale. He was then negotiating with ESB in February 2004, urging them to wait ninety days to allow him to sell the property and promising to provide ESB with at least $75,000 in net proceeds from this sale. After exactly ninety days, he sold the property and gave ESB not one cent, showing active intent in itself; nor did he inform ESB of the sale. Thus, although the deed was recorded, the trial court properly determined that the failure to disclose badge was also applicable. See R.C. 1336.04(B)(3). See, also,Esteco, Inc. v. Kimpel, 7th Dist. No. 07CO3, 2007-Ohio-7201, ¶ 55
(transfer can still be categorized as undisclosed even if deed was recorded). *Page 15 
 ¶ {72} Fourth, at the time of the transfer, the debtor had not only been threatened with suit but he had already been sued by this creditor and the house was awaiting a foreclosure sale. See R.C. 1336.04(B)(4). Even after the mistaken release, a sheriff's sale was scheduled and interrupted by another bankruptcy filed by Donald B. ESB filed objections within that bankruptcy action. Thereafter, negotiations were ongoing with ESB, and an agreement was proffered by Donald B.'s counsel agreeing to give ESB $75,000 from the sale of the property if they could wait until late May 2004. ESB even insisted at that time that the sale not be to an insider. Just after dismissing the bankruptcy action and just before this time expired, Donald B. transferred the house to his trust and then to his parents.
¶ {73} Moreover, regarding the fifth and ninth badges of fraud, the transfer was of substantially all of the assets of the debtor, and the debtor either was insolvent or became insolvent shortly after the transfer. See R.C. 1336.04(B)(5) and (9). See, also, R.C. 1336.02(A)(1) (debtor is insolvent if sum of debts is greater than all of the assets) and (2) (debtor who is generally not paying his debts as they become due is presumed to be insolvent). The testimony, the evidence, including the bankruptcy filings, and the inferences that can be drawn therefrom support these conclusions, and such conclusions are not currently contested.
¶ {74} Applying the eighth badge, a rational fact-finder could conclude that the value of the consideration received by the debtor was not reasonably equivalent to the value of the property. See R.C. 1336.04(B)(8). This a weight of the evidence and credibility question. Appellants introduced testimony that the fair market value of the property was $70,000. However, the mortgage loan application filed on behalf of Donald F. with information provided by Donald B. stated that the property was worth $178,000. Two sheriff appraisals set the value at or over $90,000. Furthermore, ESB's in-house appraiser documented that he believed the fair market value was $112,500, and this was for purposes of preparing for a foreclosure sale, not for purposes of establishing value for the fraudulent conveyance action. Finally, it could also be determined that the only value given was $30,000 as the testimony regarding $45,000 worth of past loans could have been disbelieved as the proffered checks dating back to the eighties could be viewed as gifts. Alternatively and additionally, the $30,000 was not actually value to the debtor where the debtor spent the money fixing the house that is now owned by the people who paid that $30,000. *Page 16 
 ¶ {75} We note here that it is the debtor's fraud we are considering under R.C. 1336.04(A)(1), not any other person's intent, knowledge or faith. In considering all of the above badges of fraud and the facts utilized to support them, there is more than some competent, credible evidence for the trial court to conclusively determine that Donald B. transferred the property with actual intent to hinder, delay or defraud any creditor under R.C. 1336.04(A)(1). Donald B.'s actual fraudulent intent is shown by clear and convincing evidence, although only preponderance of the evidence is required. See Millstone Dev. Ltd. v.Berry (May 9, 2002), 10th Dist. No. 01AP-907, ¶ 50; BancOhio Nat. Bankv. Schiesswohl (Aug. 3, 1988), 9th Dist. Nos. 13224, 13234 (regular civil burden since statutory action, which does not specify higher standard, as opposed to purely equitable action to set aside deed due to fraud). See, also, Household Fin. Corp. v. Altenberg (1966),5 Ohio St.2d 190, 192-193 (fraud requires only preponderance of evidence standard in action at law, but clear and convincing evidence in cases seeking equitable relief to set aside or reform written document).
¶ {76} At this point, appellants urge the applicability of the following defense in R.C. 1336.08(A):
¶ {77} "A transfer or an obligation is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."
¶ {78} The statute continues to provide that judgment may be entered against either: "(a) The first transferee of the asset or the person for whose benefit the transfer was made; (b) Any subsequent transferee other than a good faith transferee who took for value or from a subsequent transferee." R.C. 1336.01(B)(1).
¶ {79} We begin by pointing out that appellants had the burden regarding their defense. Besides the general premise that defendants have the burden of establishing defenses, it is specifically well-established that once the UFTA plaintiff meets its burden of establishing a fraudulent transfer under R.C. 1336.04, the burden shifts to the defense. See, e.g., Cardiovascular Thoracic Surgery of Canton,Inc. v. DiMazzio (1987), 37 Ohio App.3d 162, 166; Abood v. Nemer (1998),128 Ohio App.3d 121, 155.
¶ {80} Next, we refer to the aforementioned concepts within the badges of fraud analysis that the transfer from the trust to Donald F. and Rosemarie was still a transfer by the debtor since Attorney Beck was merely the trustee of and agent for Donald B. *Page 17 
The trust could be canceled by Donald B. without objection by the trustee or any other party. In fact, Donald F. had never met or heard of Attorney Beck until months after the conveyance. Rather, Donald F. believed he and his wife were buying the property directly from their son. It could also be argued that the transfer to Donald B.'s trust was made solely for their benefit. Under all of the facts and circumstances here, the trial court could reasonably determine that Donald F. and Rosemarie were essentially first transferees, whose defense would have to be that they took in good faith and for a reasonably equivalent value. See R.C. 1336.08(A). See, also, R.C. 1336.08(B)(1) (judgment can be entered against the first transferee or the person for whose benefit the transfer was made).
¶ {81} As for reasonably equivalent value, we refer to our discussion under the badges of fraud regarding the value of the property and the ability of the court to disbelieve that there existed $45,000 in past loans (as opposed to gifts). The court could also believe that any such loans were not actually forgiven as a result of the transfer. Lastly, the court could conclude that the $30,000 was not actually paid to the debtor (since it was then spent on the transferees' own property).
¶ {82} In any event, even if appellants are correct in their position that there were two transfers and that the transfer from the trust to them should not be considered the first transfer from the debtor, the trial court could rationally find that Donald F. and Rosemarie failed to carry their burden of establishing the subsequent transferee defense. The language of R.C. 1338.06(A), placing requirements on the predecessor transferee and then using the phrase "subsequent transferee," means that to be a subsequent transferee, there must have been a predecessor transferee who met the statutory requirements. See Smith and Kennedy, Fraudulent Transfers and Obligations (1992) 43 S.C. L.Rev. 70, 714 (defense for good faith transferee for value or "successor to protected transferee"). Thus, in order to utilize the defense in R.C. 1338.06(A), the first subsequent transferee must have taken from (i.e. must be the transferee of) a person who took in good faith and for a reasonably equivalent value. See id. See, also, Comment of National Conference of Commissioners on Uniform State Laws (1989) (this defense is an adaptation of the Uniform Fraudulent Conveyance Act, which used archaic language); former R.C. 1336.09 of the UFCA (showing that "subsequent transferee" replaced "one who has derived title immediately or mediately from such purchaser"). *Page 18 
 ¶ {83} It is uncontested that Attorney Beck, as trustee and as the claimed first transferee, gave nothing in return for the transfer. Further, it could reasonably be found that the trustee did not take in good faith, considering his on-going negotiations with ESB on the sale of the residence and the payment of their claim and his specific complaints to ESB about their requirement that the purchaser not be an insider of Donald B. Either way, Donald F. and Rosemarie's predecessor did not meet the statutory requirements in R.C. 1338.06(A). Consequently, they could not use the subsequent transferee defense in that division.
¶ {84} Still, where the subsequent transferee took from an original transferee who did not meet the R.C. 1338.06(A)(1) test, there may be a defense under R.C. 1338.06(B)(1)(b). This subsection provides a defense to a subsequent good faith transferee who took for value or from any subsequent transferee. R.C. 1338.06 (B)(1)(b). The latter category (a good faith subsequent transferee who took from a subsequent transferee) is inapplicable because Donald F. and Rosemarie did not take from a subsequent transferee; they claim that they took from the first transferee. This leaves for our analysis the former category (a subsequent transferee who is a good faith transferee who took for value).
¶ {85} We thus turn to the good faith analysis. Good faith is essentially a weight of the evidence question. The determination of a lack of good faith does not rely solely on actual intent but can involve an inquiry into the party's motive and purpose. Castle Properties v.Lowe's Home Centers, Inc. (Mar. 20, 2000), 7th Dist. No. 98CA185. Although good faith generally denotes honesty of purpose and freedom from intention to defraud, the court can consider evidence of what is reasonable in order to evaluate good faith and can evaluate any objective facts that contradict the suggestion of a subjectively honest purpose. Id.
¶ {86} Here, Donald F. and his wife regularly signed any documents placed in front of them by their son without asking questions. They knew their son had been having financial problems for years, and they claimed to have loaned him $60,000 since the late eighties. (Tr. 294). Donald F. claimed to have no knowledge that ESB was foreclosing on the property. This could be seen as lacking credibility since he had intervened in this very foreclosure suit in February 2003. He also essentially admitted to receiving another fraudulent conveyance of the same property and the 424 property in 2001. These conveyances were at issue in this very same lawsuit, until Donald F.'s *Page 19 
own attorney negotiated a sale of 424 and paid all net proceeds to ESB, the creditor of Donald B. His attorney also once negotiated the ability to sell 455 promising that in July 2003, over $115,000 would be paid to ESB, who was not even his creditor. When this sale did not take place, Donald F. signed 455 back to his son for no known consideration (basically admitting the fraudulence of the 2001 conveyance).
¶ {87} Still, less than a year later, he and his wife allegedly purchased 455 from their son for $30,000 (plus $45,000 in claimed loan forgiveness from many years ago). The foreclosure lawsuit was still pending at the time of this transfer. Donald F.'s son, Donald B., stayed in the house and paid the ABN mortgage that Donald F. and Rosemarie executed. Donald B. testified that he put the $30,000 he received in the sale from his parents back into the house that they had just purchased. Finally, Donald F.'s own mortgage application listed Eastern as a creditor on the property with a first mortgage of $30,000.
¶ {88} In conclusion, regarding Donald F.'s good faith or lack thereof, the defense had the burden to prove good faith; the plaintiff did not have the burden to prove a lack of good faith. In any event, the plaintiff in fact established such a lack of good faith. The trial court had the opportunity to hear Donald F.'s testimony and view his gestures, eye movements, voice inflection and demeanor. We cannot second guess the weight assigned to his claims. There is some competent, credible evidence that Donald F. did not take the property in good faith, and we thus cannot disturb the court's decision on such matter. See State v.Wilson, 113 Ohio St. 382, 2007-Ohio-2202, ¶ 26.
¶ {89} Contrary to appellants' next claim, Rosemarie is properly held liable. In response to appellants' complaint that the judgment did not make a ruling regarding Rosemarie, we note that the court held in favor of ESB and declared the transfer fraudulent without finding any defense applicable. (The court also found lis pendens applicable.) These rulings necessarily provide a ruling against Rosemarie.
¶ {90} Her lack of good faith can also be inferred from all of the facts and circumstances. Donald F. essentially testified that as parents, he and his wife bought the house and signed all the other papers because their son, who was well-known to have financial problems, asked them to do so. It must also be remembered that although the 2001 transfer of the two properties was to only her husband and thus he was the only party who intervened in the foreclosure action, Rosemarie signed the July *Page 20 
22, 2003 deed transferring 455 back to Donald B. She also provided power of attorney to her son in May 2003 to sell and finance her properties in Mahoning County.
¶ {91} Rosemarie was a defendant who did not testify. ESB claims that at deposition, it was agreed that due to Rosemarie's illness, her husband's testimony would be imputed to her, and they took this to mean the agreement would apply throughout the case. In any case, contrary to appellants' suggestions, ESB was not required to force her to testify in order to show that any claim to good faith was not credible. It was Rosemarie who had the burden to show her good faith in order to establish a defense to a R.C. 1336.04(A)(1) fraudulent transfer; it was not ESB's burden to show her lack of a good faith defense.
¶ {92} For all of the above reasons, the court did not act contrary to the manifest weight of the evidence in failing to apply the defenses for subsequent transferees in appellants' favor. Thus, we only briefly review the alternative argument.
¶ {93} Besides finding the transfer fraudulent under R.C. 1336.04(A)(1) (which can be used by creditors with pre-existing claims and by those whose claims arose after the transfer and to which the R.C. 1336.08(A) defense applies), the trial court also found the transfer fraudulent under R.C. 1336.05 (which is available only to creditors with pre-existing claims such as ESB). This alternative statute, R.C. 1336.05, provides two options.
¶ {94} First, a transfer made by a debtor is fraudulent if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer. R.C. 1336.05(A). Second, a transfer made by a debtor is fraudulent if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent. R.C. 1336.05(B).
¶ {95} The court focused on R.C. 1336.05(B) by finding that Donald B. transferred the property to an insider for an antecedent debt, the debtor was insolvent and the insider had reasonable cause to believe (actual knowledge is not required) that the debtor was insolvent. The court's various findings essentially found (A) applicable as well. Appellants urge that the court misapplied these statutes because it is the transfer from the debtor that is viewed under both divisions of this statute, not the later transfer. This goes back to the issue of whether Donald B. by way of his trust *Page 21 
transferred the property to his parents or whether utilization of the trust as a conduit interrupted the statutes which speak of a transfer from a debtor. Regardless, as analyzed above, the trial court's decision that the debtor engaged in actual fraud under R.C. 1336.04(A)(1) can be upheld under principles which do not utilize this trust as a debtor theory. These assignments of error are without merit for the myriad of reasons expressed above.
 ASSIGNMENT OF ERROR NUMBER FIVE ¶ {96} Appellants' fifth and final assignment of error provides:
¶ {97} "THE TRIAL COURT ERRED IN ADMITTING THE HEARSAY BROKER'S PRICE OPINION INTO EVIDENCE."
¶ {98} During the testimony of ESB's general counsel, ESB introduced Plaintiff's Exhibit 21, an October 30, 2004 Broker's Price Opinion (BPO) disclosing $112,500 as the fair market value of the realty. This BPO was prepared by a realtor who did not testify. She was not an employee of ESB but rather was contracted by ESB to prepare the BPO. The BPO was then reviewed by an in-house appraiser who wrote on the BPO that he agreed with the realtor's assessment of $112,500. See Exhibit 21. General counsel testified that the document was in ESB's collections file to aid in determining how to determine bidding instructions at the foreclosure sale. (Tr. 171).
¶ {99} Appellants' counsel objected that the realtor's determination of value constituted hearsay. However, counsel admitted that the bank's handwriting with respect to its conclusions was admissible. (Tr. 355, 358). Appellee argued that the document was not offered merely to show value but was also offered to show that they were continuing to act against the property and had not intended the release. They also urged that an ESB employee independently reviewed the BPO and came to the same value. (Tr. 357-358). The magistrate overruled the objection finding that it was a business record as it was prepared at the bank's instruction and placed in its file and was kept and reviewed in the normal course of business.
¶ {100} On appeal, appellants urge that the business records exception to the hearsay prohibition is inapplicable because it requires the record to be made by ESB not just kept by them. As for prejudice, appellants state that the court's judgment entry must have relied on the realtor's value in part because the entry states that the actual *Page 22 
value of the property was disputed by testimony and that all estimates put the value considerably over $30,000 cash.
¶ {101} Appellee counters that the business records exception contains no requirement that the business's employee made the document as long as it is made by a person with knowledge and is a record of regularly conducted activity. Appellee alternatively posits that any error was harmless because two sheriff's appraisal put the value at or over $90,000.
¶ {102} The admission of business records under Evid. R. 803(6) rests within the sound discretion of the trial court. Peters v. Ohio StateLottery Comm. (1992) 63 Ohio St.3d 296, 299. The business records exception to the hearsay ban provides in pertinent part:
¶ {103} "Records of regularly conducted activity. A memorandum, report, record, or data compilation, in any form, of acts, events, or conditions, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or as provided by Rule 901(B)(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. * * *."
¶ {104} Here, the BPO is a memorandum, report, record or data compilation, in any form. The BPO is about conditions of the house and neighborhood and was made at or near the time that those conditions were observed. The BPO was made by a person with knowledge, and ESB's handwriting thereon was made by a person with knowledge and from information transmitted by a person with knowledge. It was in the regular practice of the business activity to make the document as shown by a witness who is not disputed to be unqualified. The source of information and the method or circumstances of preparation do not indicate a lack of trustworthiness as it was generated as a regular business activity in preparation for a sheriff's sale regarding a debtor; it was not generated to prepare for the fraudulent conveyance lawsuit against the debtor's transferees. This foundation was not contested at trial. See Commercial Natl. Bank v. Zeis (Oct. 13, 1987), 3d Dist. No. 13-86-3 (where in-house appraisals were admitted over objection based merely on lack of ability to cross-examine, not on foundational requirements). *Page 23 
 ¶ {105} The question presented is whether the language "it was the regular practice of that business activity to make the [document]" means that the business itself had to internally make the document. See Evid. R. 803(6) (emphasis added). Since person with knowledge is not modified by employee and since someone can make the document from information transmitted by such person with knowledge, the language of the rule (practice of the regularly conducted business activity to make) does not prohibit introduction of company documents merely because the business hired an independent contractor or outside agent to make the document for them.
¶ {106} Admittedly, the Staff Note to this exception states that the trustworthiness of the document is derived from the fact that employees, who are under an obligation to make the document, will be accurate since a business cannot as a matter of course function without adequate records. However, an agent is also under such an obligation once they agree to accept a business contract to make a document for their principal.
¶ {107} In addressing this rule, the Supreme Court has stated the document must be made by those with a self-interest to be served through accurate entry with knowledge the entry will be relied upon by the business. Weiss v. Weiss (1947), 147 Ohio St. 416, 425-426. This does not require the maker to be an actual employee. A hired agent or independent contractor would have a self-interest in accuracy with knowledge its document will be relied upon by the business. Cf.Mastran v. Uhrichich (1988), 37 Ohio St.3d 44, 48-49 (patient's self-serving statement in medical record unrelated to medical treatment describing how accident occurred not admissible).
¶ {108} Even the cases cited by appellants do not require the entry to be made by an employee. The main case appellants rely upon uses the following telling language: "such as an employee" and the "exception does not extend to information provided by outside sources who wereunder no business duty to be accurate when preparing the records."State v. Barron (June 8, 2000), 10th Dist No. 99AP-59 (emphasis added) (dealing with patient's alleged writing on sign-in sheet). See, also,Babb v. Ford Motor Co. (1987), 41 Ohio App.3d 174, 177 (reports from outside sources such as consumer letters to manufacturer not admissible as no interest in accuracy to benefit business recipient). Thus,Barron actually stands for the proposition that an employee is only one type of permissible author and that an outside source is permissible if they are under a business duty to the recipient to be *Page 24 
accurate and the document is kept in the regular course of the business recipient. See id.
¶ {109} We have held similarly in the recent past. As an alternative to our resort to the public records exceptions, this court stated that an autopsy report can be admitted as a business record of the coroner's office, even when no employee of that coroner's office made the report.State v. Mitchell, 7th Dist. No. 05CO63, 2008-Ohio-1525, ¶ 110
(Columbiana County Coroner's Office contracted Cuyahoga County Coroner's Office to perform certain forensic autopsies). First, we pointed out that it has been held that one entity can rely on the records of another entity to arrive at figures for its own records. Id., citing GreatSeneca Fin. v. Felty, 170 Ohio App.3d 737, 2006-Ohio-6618 (assignee of creditor can introduce documents received from original creditor as business records). We also concluded that since the autopsy record was prepared by the contractual agent of the coroner for the use and maintenance of said coroner, it can be considered to have in fact been prepared by the coroner itself. Id.
¶ {110} As such, the admission of such a record is a discretionary decision wherein the trial court determines if the person making the document sufficiently satisfies the trustworthiness foundational element of having a self-interest served through accurate entry on behalf of the business recipient. An individual or agency retained by the business to generate a document to be kept in the regular course of the business and for the purpose of a regularly conducted business activity is a very different scenario from a business's receipt of unsolicited letters from outsiders. It is not unreasonable to find trustworthiness in a case such as the one before us.
¶ {111} In fact, appellants did not question foundational trustworthiness at trial; they merely questioned whether as a matter of law an agent could generate a business document and complained that they could not cross-examine the appraiser, whom they could have called on cross-examination; the inability to cross-examine is not a defense to a business records exception. See Commercial Bank, 3d Dist. No. 13-86-3. Lastly, we note that any complaints about the realtor's mere exterior viewing of the residence go to weight, not admissibility or foundational trustworthiness. Consequently, we conclude that the trial court's admission of the exhibit was within its discretion. *Page 25 
 ¶ {112} In any event, prejudice is lacking because appellants' own appraisal puts a value at $70,000 and the Buccis claim to have paid $75,000. These alleged values were over $30,000, as stated in the contested portion of the court's entry. As we previously discussed, the court could disbelieve the $45,000 in loan forgiveness or find that the $30,000 check was not actually paid to the debtor since he spent the money on the purchaser's own property.
¶ {113} Furthermore, as appellee points out, an October 2003 sheriff's appraisal evaluated the property as being worth $96,000 and a September 2004 sheriff's appraisal evaluated the property as being worth $90,000. Moreover, appellants only objected below to consideration of the realtor's valuation. They specifically acknowledged that the court could consider ESB's in-house valuation of $112,500. Since the values were identical, we cannot find prejudice by mere speculation that the court may have also considered the realtor's value as the tipping factor in its weighing of the evidence. Finally, we note that Donald F. Bucci's own mortgage loan application with ABN listed a value in May 2004 of $178,000 for the 455 property, well above that listed by the realtor. For all of the above reasons, this assignment of error is overruled.
¶ {114} For the foregoing reasons, the judgment of the trial court is hereby affirmed.
Donofrio, J., concurs.
DeGenaro, P.J., concurs.
[1] We note here that appellants' argument is actually based upon the lack of recorded mortgage (rather than reliance on a release) as they concede that they were not aware of the recorded release of ESB's mortgage (only Donald B. and his attorney were aware of this release). *Page 1