[Cite as *Estate of Cruz v. Peffley*, 2023-Ohio-2081.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| ESTATE OF RAFAEL M. CRUZ, et al. | : | |
| Plaintiffs-Appellees | : | Appellate Case No. 29435 |
| v. | : | Trial Court Case No. 2018-CV-5142 |
| DANIEL PEFFLEY, et al. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendants-Appellants | : | |
| | : | |

. . . . . . . . . .

O P I N I O N

Rendered on the 23rd day of June, 2023.

. . . . . . . . . .

TOBY K. HENDERSON, Atty. Reg. No. 0071378, BRYAN K. PENICK, Atty. Reg. No. 0071489, & KAITLYN C. MEEKS, Atty. Reg. No. 0098949, 1900 Stratacache Tower, 40 North Main Street, Dayton, Ohio 45423
        Attorneys for Plaintiffs-Appellees

MICHAEL P. MCNAMEE, Atty. Reg. No. 0013861, GREGORY B. O'CONNOR, Atty. Reg. No. 0077901, ALEXANDER W. CLOONAN, Atty. Reg. No. 0095690, 2625 Commons Boulevard, Beavercreek, Ohio 45431
        Attorney for Defendants-Appellants

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendants-Appellants Chad Leopard, Joe Leopard, and Joe's Landscaping

of Beavercreek, Inc. (collectively, "Defendants") appeal from a judgment in favor of 12 Plaintiffs following a jury trial. Defendants contend that (1) the trial court erred by granting summary judgment to Plaintiffs on the issue of whether Plaintiffs had filed their fraudulent transfer claims within the statute of limitations; (2) the trial court erred in denying Defendants' motion for summary judgment on the issue of whether Plaintiffs had standing to sue; (3) the judgment against Defendants was against the manifest weight of the evidence because Plaintiffs failed to mitigate their damages; (4) the judgment against Defendants was against the manifest weight of the evidence because nine of the twelve Plaintiffs did not provide any evidence of good faith; and (5) the judgment against Chad Leopard was against the manifest weight of the evidence to the extent that he was not credited with an initial cash investment of $25,000.

{¶ 2} For the reasons that follow, we will reverse the judgment to the extent that it entered judgment in favor of the nine non-testifying Plaintiffs as against the manifest weight of the evidence due to their failure to present the jury with any evidence that they invested in good faith. In all other respects, the judgment of the trial court will be affirmed. The cause will be remanded to the trial court for further proceedings consistent with this opinion.

I. Facts and Course of Proceedings

{¶ 3} The facts underlying this case involve a Ponzi scheme orchestrated over several years by its operator, William Apostelos. The key to a Ponzi scheme is to funnel proceeds received from new investors to previous investors under the guise that these

funneled proceeds were profits from a legitimate business venture. *See, e.g., In re Ramirez Rodriguez*, 209 B.R. 424, 430 (Bankr.S.D.Tex.1997). By doing so, the operator of the Ponzi scheme, in this case Apostelos, creates an illusion that a legitimate profit-making business opportunity exists, which then induces further investment. *Id.* Typically, investors are promised high rates of return, and initial investors obtain a greater amount of money from the Ponzi scheme than those who join the Ponzi scheme later. *Id.* "As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse." *Id.* The promised rates of return to investors render a Ponzi scheme operator like Apostelos insolvent from the scheme's inception, because the returns exceed any legitimate investments. *Id.* at 430-431.

{¶ 4} For approximately eight years, Apostelos used several business entities to disguise his Ponzi scheme as a legitimate business venture. He also used family members and attorneys to make people feel more comfortable investing with him. Apostelos masked his Ponzi scheme by explaining to investors that he was able to offer high rates of return by issuing high interest, short-term loans and by investing heavily in apartment buildings, asphalt companies, stocks, gold and silver, racehorses, farm equipment, and strategically-located land. With some investors, he allowed them access to Ameritrade accounts showing positive returns on stock investments. Apostelos also convinced some early investors to write referral letters to potential investors. Apostelos

reassured many investors by signing promissory notes when they invested. He was able to infiltrate legitimate businesses like car dealerships to such an extent that they trusted management of the funds contained in their retirement plans to Apostelos. But like all Ponzi schemes, no matter how skilled the operator is at artifice, the scheme had to end.

{¶ 5} In the summer and fall of 2014, some investors noticed that Apostelos was late on payments and checks started bouncing. This culminated in some investors filing an involuntary bankruptcy proceeding against Apostelos in the fall of 2014. Around the same time, the FBI raided Apostelos' office in Springboro. Soon thereafter, the United States filed a forfeiture complaint against Apostelos, and the bankruptcy trustee began seeking financial information from banks that had processed transactions involved in the Ponzi scheme. Apostelos ultimately pled guilty in 2017 for his role in masterminding a multi-million-dollar Ponzi scheme. During the criminal case, including through his sentencing and appeal, the government withheld the records seized from Apostelos.

{¶ 6} News stories broke about the Ponzi scheme soon after the FBI raided Apostelos' offices. The Ponzi scheme had officially collapsed. The fallout was wide and severe. Overall, Apostelos had received money from investors totaling almost 79 million dollars. Although he paid approximately 67 million dollars to many of these same investors to keep the Ponzi scheme going, many investors were left with huge losses.

{¶ 7} In February 2018, the bankruptcy trustee announced that it intended to dismiss the bankruptcy case involving Apostelos. Some of the Ponzi scheme victims then filed suit in state court and served subpoenas on the banks that had been involved with the entities involved in the Ponzi scheme. The victims also sought information from

the Department of Justice and the FBI. Ultimately, the victims received sufficient information to begin identifying the specific transfers from Apostelos to investors in the Ponzi scheme, including those made to the "net-winners." Decision Granting Plaintiffs Motion for Summary Judgment Finding Plaintiffs Timely Filed Their Claims (Nov. 19, 2021), p. 2.

{¶ 8} On November 5, 2018, 30 plaintiffs filed a complaint in the Montgomery County Court of Common Pleas against 75 defendants, asserting fraudulent transfers of funds in violation of the Ohio Uniform Fraudulent Transfer Act, R.C. 1336.04. According to the complaint, the 30 plaintiffs were "net-losers" in the Apostelos Ponzi scheme, and the 75 defendants were "net-winners" in the scheme. A net-winner was someone who received more money from Apostelos and his related entities than they had invested with him. A net-loser was someone who received less money from Apostelos and his related entities than they had invested with him.

{¶ 9} On December 13, 2019, at the trial court's direction, the Plaintiffs filed a first amended complaint adding Apostelos as a defendant. Over the course of the next two years, the parties filed numerous motions for summary judgment; the rulings on a couple of those motions are the subject of the current appeal. Further, several parties were voluntarily dismissed from the action, and a few parties were replaced by their estates due to deaths that occurred while the case was pending. By the time the case proceeded to trial, only twelve plaintiffs and five defendants remained.

{¶ 10} The jury trial was held in January 2022. The evidence presented about the investments of various Individuals was as follows:

{¶ 11} Soneet Kapila, a certified public accountant and expert in forensic investigations, testified first at the trial. Trial Tr. 97-320. Kapila explained that Apostelos had raised $78,830,000 and had paid out $67,240,000 to investors. According to Kapila, Plaintiff's Exhibit 42-C was a list of net-winners under the Ponzi scheme. He conceded that the list of net-winners did not include a stipulation involving Joe Leopard. Plaintiff's Exhibit 42-D was a list of net-losers that Kapila compiled. On cross-examination, Kapila noted that he had not credited any alleged cash investments in his chart unless he received sufficient supporting documentation. He agreed that an individual on his chart of net winners could decrease the amount of his net winnings by showing a cash investment. In making his report, Kapila relied on counsel's representations and source documentation.

{¶ 12} Kapila opined that a 50% interest rate included in a promissory note should be a red flag for an investor. One of Plaintiff Gloria Cruz's promissory notes with Apostelos included a 50% interest rate. Kapila also agreed that discovering that an enterprise is insolvent is a warning sign, and that post-dated or bounced checks would be a cause for concern.

{¶ 13} Kapila conceded that there were some individuals with higher net gains than the Defendants in this case who were not sued by the Plaintiffs. Kapila was not asked to determine whether any of the Defendants had invested in good faith. He conceded that he could not trace every dollar in the Ponzi scheme to a particular person, because the funds were commingled. For example, he could not determine whether the particular money invested by the Plaintiffs in this case ended up in the possession of the particular

Defendants in this case. Kapila agreed that some of the Plaintiffs in this action received payments from Apostelos after investing money with him.

{¶ 14} Plaintiff John Goodman, one of the investors in the Ponzi scheme, testified next. Trial Tr. 321-366. He had lived in Virginia for 30 years and was referred to Apostelos by his long-time friend, Paul Walter. Goodman met with Apostelos in late April or early May 2014. He asked Apostelos about the expected profit, and Apostelos explained that he owned and traded in racehorses and used farm equipment. Goodman had faith in Apostelos when he invested with him. He received two payments totaling $50,000 from Apostelos. But Goodman learned in late September 2014 that the FBI was investigating Apostelos. He attempted to contact Apostelos, asking that $300,000 of his $350,000 be returned. Apostelos did not respond. The FBI talked to Goodman in October 2014.

{¶ 15} Goodman conceded that he had not consulted with his wife, financial advisor, or tax preparer before investing with Apostelos. His wife told him that he lacked wisdom and that she would not have approved of the investment with Apostelos if he had consulted her. Further, Goodman did not conduct a background check on Apostelos or any type of internet search. Goodman believed the promissory notes given to him by Apostelos were binding and sufficient to keep track of his business dealings.

{¶ 16} Plaintiff Dr. Rafael F. Cruz ("Rafael") testified next. Trial Tr. 375-520. He is related to Rafael M. Cruz (his father), Gloria Cruz (sister), Joe Mullane (brother-in-law), Alexander Mullane, and some of the other Plaintiffs. A friend of Rafael's, Dr. Lou Pilati, introduced him to Apostelos. Rafael met with Apostelos and learned that he used

promissory notes. Apostelos mentioned many investments with which he was involved, including apartment buildings, land, and a variety of farms. After Rafael made a $70,000 investment with Apostelos, Dr. Scott Doak vouched for Apostelos. Rafael spoke with Dr. Pilati and an investment advisor about Apostelos. The investment advisor told Rafael that Apostelos was not licensed and was not well known. Rafael received one payment from Apostelos. The remainder of the time, Rafael immediately reinvested any money that Apostelos paid him.

{¶ 17} Eventually, Rafael considered Apostelos enough of a friend to introduce him to his family. Sometime around the summer of 2013, Rafael's father told him and his sister that there was a tax issue concerning Apostelos' promise to roll over an investment. This concerned Rafael. At that time, Rafael found out that his father had invested approximately $4 million with Apostelos, which resulted in a tax problem of around $1.3 or $1.5 million. Apostelos explained that he was working with the IRS to fix the mistake. During that time, Apostelos was in bad health with spine problems. Apostelos promised to sell personal assets to fix the tax problem. Rafael's father died in April 2020 at the age of 89; he had relied on Social Security after the fallout from the failed Ponzi scheme, had divorced his wife, and had lived at different times with Rafael or his daughter.

{¶ 18} Rafael's sister, Gloria Cruz, lived in New Jersey with her husband, Joe Mullane. Both Gloria and Joe Mullane invested with Apostelos based on Rafael's recommendation. Gloria had interviewed Apostelos by phone and met with him.

{¶ 19} According to Rafael, in November 2014, federal authorities raided Apostelos' offices. He was indicted in 2016. Rafael testified to a grand jury.

Eventually, Rafael obtained a judgment against Apostelos.

{¶ 20} Rafael testified that he had believed what he was told about Apostelos and had invested his money with Apostelos in good faith. When Apostelos was in bad health, Rafael had helped him move some equipment, because he trusted Apostelos. According to Rafael, his trust in Apostelos increased over time. Even when the tax issue with his father came up, Rafael continued to trust Apostelos, because he assumed the tax issue had arisen because Apostelos' health was declining.

{¶ 21} On cross-examination, Rafael testified that he believed all those who had invested with Apostelos had invested in good faith. At that time, Elizabeth Nickell was Rafael's girlfriend and had invested with Apostelos, but Rafael did not know how much she had invested. Leah Cruz is Rafael's stepmother; he did not have a good relationship with her. Rafael left it up to his attorney who to sue. At the time Rafael invested with Apostelos, Rafael's financial advisor at USB had told him to be cautious. Rafael eventually stopped using this financial advisor, because Rafael's calls were not returned and USB's performance had not met his expectations.

{¶ 22} Apostelos guaranteed a 10-15% return on investments. He did not charge Rafael any fees but explained that he would keep any return on investment above the guaranteed return rate. Although Apostelos did not provide quarterly reports as he had promised to do, Rafael was given two or three reports that looked good. Further, he received reassurances from Dr. Doak and Dr. Pilati.

{¶ 23} Rafael referred his father to Apostelos. Based on Apostelos' good reputation and his lies, Rafael believed that the tax problem involving his father would be

worked out. During the summer of 2014, Rafael sent several emails to Apostelos expressing concerns about his father's IRS problem. It was a hectic time for Rafael when Apostelos signed a personal guarantee to take care of his father's tax problem. By August 2014, Rafael believed that Apostelos was liquidating some assets to take care of the tax problem. An attorney associated with Apostelos told Rafael that he was addressing the tax problem and would take care of it.

{¶ 24} Rafael believed that Ameritrade should have had a mechanism for catching Apostelos' fraud. Defendant Daniel Peffley called Rafael for help. According to Rafael, Peffley lied and said he was a victim when in fact he was a net-winner under the Ponzi scheme. Pursuant to Peffley's request, Rafael drafted an email to be sent to television stations and newspapers.

{¶ 25} Plaintiff Mike Harvey testified next. Trial Tr. 521-601. Harvey was originally from Kettering but lived in Indiana at the time of trial. His father had married Linda Dennis, whose son Jason Dennis had been investing with Apostelos for quite a while. Harvey's father began investing with Apostelos in December 2012. Harvey's father had asked Apostelos for collateral or a guarantee before he recommended Apostelos to his family. Apostelos lied and gave Harvey's father a farm as a guarantee. Harvey's father went out and saw the property.

{¶ 26} Harvey, Andrew White, and Harvey's father drove to Indianapolis to meet with Apostelos. Dwight Wallace, the best friend of Harvey's father, also met with them. Apostelos was impressive and made sense. According to Apostelos, he was giving out high-interest, short-term loans to companies who needed them. He also was investing

in farms, asphalt companies, and real estate. Apostelos did not provide the men with any information as to whom Apostelos was loaning money or their financial stability. Harvey drove to Dayton for a second meeting with Apostelos and was impressed by the set-up of Apostelos' office. Harvey's wife at the time, Kristen Harvey, became interested in investing, and Harvey traveled with her to a third meeting with Apostelos. At that time, they met with Steve Cudder, an attorney in Dayton, and that meeting inspired more confidence in Apostelos. Harvey's mother (Carolyn Hedderly) became interested in investing with Apostelos as well and met with him. Harvey was not at that meeting. Harvey also talked with his sister about Apostelos.

{¶ 27} In October 2014, Harvey's father called him and reported that there were chains on the doors of Apostelos' office. Harvey immediately began crying and was devastated. He told his wife. Harvey's net loss was over $200,000. With the losses incurred by his now ex-wife, they had a total net loss of over $500,000. Harvey did not believe the rollovers of investment earnings with Apostelos were included in the expert's report.

{¶ 28} Harvey believed he had done a search on the internet about Apostelos before investing, but he could not remember for certain. Also, he thought their stockbroker may have warned his wife about rolling over an IRA. October 2014 was the first time that Harvey suspected any wrongdoing by Apostelos. Prior to that, Harvey had received some money back from his investments with Apostelos. For example, in July 2014, Harvey needed to pay off his home equity line. Although Apostelos delayed the payment by giving an excuse that the money was tied up, he eventually paid the money

to Harvey.

{¶ 29} Harvey eventually spoke with the FBI, and Harvey's father hired an attorney. The FBI told Harvey that suing Apostelos was a waste of time. The FBI had seized Apostelos' assets, and Harvey relied on the government to chase the assets. Harvey had received a small check from the government years earlier and believed he would receive more if the government recovered additional assets from Apostelos.

{¶ 30} Harvey had entered into an agreement with his ex-wife pursuant to which any money recovered from the Defendants in this lawsuit was to be split 70/30 in his ex-wife's favor. Because his father had passed away, Harvey would receive 50% of any recovery on behalf of his father as one of his father's two beneficiaries. Harvey's ex-wife would not receive any of those proceeds.

{¶ 31} The deposition of Shawn Anthony Stoner was read into the record at trial. Trial Tr. 602-617. He was a licensed attorney in North Carolina who had met with Apostelos on three occasions. When he went to Apostelos' office, Attorney Scudder, Scott Doak, and Apostelos' wife and sister were there. Apostelos showed him stock portfolios of clients like Rafael Cruz. During their third meeting, Apostelos wanted additional investment income to purchase land near interstate exits. Stoner had been introduced to Apostelos through Lee Struck, who had been introduced to Apostelos by Cliff Bostrom.

{¶ 32} The deposition of Racey Morris was read into the record at trial. Trial Tr. 617-632. Morris was a financial advisor with New York Life. He had been introduced to Apostelos through a business partner and had met with Apostelos six or seven times.

Apostelos had offered Morris commissions and referral fees, but Morris had not referred anyone to Apostelos. Morris had invested with Apostelos and was promised 20% interest on his investment. Apostelos told him that he was investing in real estate deals. Morris trusted the individual who had referred him to Apostelos, so Morris did not investigate Apostelos. The promised return on investment would increase if Morris gave Apostelos more money. Morris invested his money in good faith, believing that the money was being generated legally from real estate deals. He did not suspect any wrongdoing with Apostelos until checks started bouncing and promissory notes were not paid.

{¶ 33} The deposition of Jeffrey Paul Santilli was also read into the record at trial. *Id.* at 632-646. Santilli was a dentist who lived in New Albany. He met Apostelos through Shawn Stoner, with whom he had been friends since 1990. Stoner had explained to Santilli that Apostelos had several ways to make money. Santilli had two meetings with Apostelos, during which he learned that Apostelos made money through stock options, real estate, foreclosures, and horses. Based on Stoner's recommendations and his meetings with Apostelos, Santilli felt comfortable investing with Apostelos. He invested his money with Apostelos in good faith and initially did not suspect any fraud or wrongdoing. His first suspicions that Apostelos may have been doing something wrong with Santilli's investment occurred in the middle of 2013 when Apostelos was late on a payment. Typically, Santilli would be promised 15-25% interest on his investments with Apostelos.

{¶ 34} The deposition of Paul Riedel was read into the record at trial. Trial Tr. 647-653. Todd Case, the finance manager at Beau Townsend Ford, a car dealership,

had given Riedel positive information regarding Apostelos. One of the sales managers there had called the State of Ohio to investigate Apostelos and was told that Apostelos was fine. Riedel met Apostelos, who provided him with assurances. Apostelos explained that he made his money in real estate, gold, silver, and the stock market. Riedel began investing with Apostelos in September 2008.

{¶ 35} The deposition of Joshua Otstot was read into the record at trial. Trial Tr. 654-678. Otstot worked at Beau Townsend Ford. Todd Cade, a finance employee at the dealership, had recommended Apostelos, who supposedly made his money through purchasing land and gold. At some point, Apostelos took over the investments for Beau Townsend's retirement plan. Apostelos even had his own office at Beau Townsend. Otstot waited for a while, then began investing with Apostelos. Otstot completely trusted Apostelos and invested his money with him in good faith, receiving several payments from Apostelos based on a 10-14% interest rate. Otstot eventually heard about the raid of Apostelos' offices.

{¶ 36} The deposition of Johnny Davis was read into the record. Trial Tr. 678-685. Jason Dennis had introduced him to Apostelos. Davis started investing when others at his place of employment began investing. He also introduced his wife, Carrie, to Apostelos.

{¶ 37} The deposition of Sara Dorman was read into the record at trial. Trial Tr. 685-691. She lived in Columbus, Ohio, and worked as an occupational therapist. Her father, Larry Dorman, recommended Apostelos to her. Her father worked at Beau Townsend Ford. Sara met with Apostelos twice. It was her understanding that

Apostelos invested in property and horses. She found out from her father that Apostelos went to jail. Sara had invested $20,000 with Apostelos in April 2014 and received $31,000 back in June 2014.

{¶ 38} The deposition of Jason Lane Gober was read into the record at trial. Trial Tr. 692-706. He had met Apostelos through his friend, Lonnie Wilkey, Jr., after Gober won the lottery. It was his understanding that Apostelos flipped real estate. Gober met with Apostelos over 50 times and typically picked up checks at Apostelos' offices. He was not aware of Apostelos' wrongdoing until the Dayton Daily News published an article, which was shown to Gober by a Wesbanco bank manager. Gober's wife had known Apostelos' son-in-law since they were kids. Gober had invested about $500,000 with Apostelos and got checks each month. There were some delays in payments to Gober a couple of months before the Dayton Daily News published a story about Apostelos' suspected wrongdoing. Gober stated that he had invested his money in good faith.

{¶ 39} Chad Leopard testified at trial. Trial Tr. 721-765. Chad lived in Beavercreek, and he had been the owner of Joe's Landscaping since 2019. His father, Joe Leopard, was the previous owner. Joe Leopard had undergone brain surgery and did not testify at trial. Chad knew the following people who had invested with Apostelos: his father, his brother Steve and his wife, his uncle Randy and his wife, Jeff Columbro, Jason Dennis, and his wife's cousin, Tony Michael. All his family members had been net-winners, except for Chad's uncle and his brother, who had been net-losers.

{¶ 40} Jeff Columbro, a salesman at Beau Townsend Ford, had referred Chad to Apostelos in 2010 and 2013. Columbro mentioned a lot of people who were investing

with Apostelos, including the Cruzes "and all the big influential people in the Dayton area." Chad had also spoken with Jason Dennis about investing with Apostelos. Chad and his father drove to Apostelos' office, and both gave cash to Apostelos during their first meeting. Apostelos added the money to an Ameritrade account and gave Chad and his father account numbers so that they could track the account. This first investment took place in July 2013. After this first investment, Apostelos asked Chad if he wanted to be a part of an equipment loan. Tony Michael hired an attorney to check out the legitimacy of the equipment loan. According to Chad, the investigation came back okay so Chad went ahead with the investment. If that investigation had revealed anything wrong with Apostelos, Chad would not have invested further with him. The parties stipulated to this fact.

{¶ 41} Chad stated that he had personally paid $111,500 to Apostelos in three payments of $58,500, $15,000, and $38,000. Chad made the $58,500 payment in cash to Apostelos at their first meeting. This cash came from Chad's safe in his basement with money he had accumulated from selling hot rod cars. Chad had received seven payments from Apostelos totaling $245,000. Therefore, Chad profited $133,500 from the Ponzi scheme. Joe's Landscaping invested $25,000 but received a $60,000 payment, resulting in a $35,000 profit from the Ponzi scheme. Chad conceded that he had testified at his previous deposition that he only contributed $25,000 in cash at the first meeting with Apostelos. According to Chad, he changed his testimony at trial because the higher amount was the amount reflected on Apostelos' records. He relied on the accuracy of Apostelos' records in making that claim. Chad stated that he had not shared

any of his profit from the Ponzi scheme to his brother or uncle, who were net-losers.

{¶ 42} Karen Ann Evans testified at the trial. Trial Tr. 766-798. She lived in Centerville and was a geriatric psychologist. Defendant Ruth Peters was her mother. A realtor showed Evans a house in 2007 that Apostelos owned. Apostelos helped her cover part of the loan, which allowed her to buy the house. She invested all $70,000 of her retirement money with Apostelos, and he then wrote her a promissory note, which promised 35% interest each year. She had received monthly checks from Apostelos' company. Ruth Peters gave Apostelos $20,000. Evans began working for one of Apostelos' companies as a loan officer. She was not alerted to any wrongdoing, and she did not work very long at that job. Evans did not believe there were any winners in the Ponzi scheme. She explained that she did not have any money in the bank from this scheme and that she could not afford the home Apostelos sold her. Evans was surprised she had been sued, because Plaintiffs' counsel appeared to be helping all the victims of the Ponzi scheme before the lawsuit began. Evans eventually was dismissed from the lawsuit.

{¶ 43} In 2007, Apostelos asked Evans to write him a letter of recommendation. Daniel Peffley called her in response to the letter and she spoke with him. If she had known then what she knew at the time of the trial, she would not have written a letter of recommendation for Apostelos. In early 2013, it came to Evans' attention that some direct deposit payments from Apostelos to investors had not been on time. As a result, Evans asked if Apostelos would go back to paying her by check. Apostelos mentioned to Evans that a $1.2 million payment to Daniel Peffley failed due to some problems with

"pinging," where the money showed up briefly in Peffley's account but then just disappeared. Evans was aware that there had been a bankruptcy proceeding from 2014 to 2018 and that a criminal proceeding against Apostelos had resulted in the seizure of all his assets.

{¶ 44} Defendant Daniel Peffley testified at the trial. Trial Tr. 816-955. He had been born in Dayton but lived in Garden Grove, California, with his wife, Judy, at the time of trial. He had retired in 2006. His brother Tim worked at Beau Townsend Ford. In late 2007 or early 2008, Tim had called him about investing with Apostelos. Subsequently, Apostelos provided Peffley with eight references and a personalized letter. Peffley spoke with each reference, all of whom had been investing with Apostelos for years. Peffley initially invested $300,000 in January 2008; he was promised a 31% return on that investment. Peffley did not have any concerns about Apostelos, because Apostelos had signed promissory notes on which he could not renege. Peffley referred Apostelos to Dennis Thompson. Peffley made another investment of $622,400 in return for a promise of 40% interest.

{¶ 45} Peffley recalled one time in 2010 when he was in the car with Apostelos in Dayton, Ohio, and Peffley asked if they could stop and talk to one of Apostelos' tenants. According to Peffley, Apostelos "got - - he about freaked when I did that." Apostelos had sent an email to Peffley in September 2013 about Peffley's request to close some accounts. Apostelos asked Peffley to stop slandering him to other clients. Four or five checks from Apostelos had bounced when Peffley tried to cash them. Peffley contacted a federal judge he knew from high school, who referred him to an attorney at a law firm.

As a result, on September 25, 2014, Peffley obtained a judgment against Apostelos in Warren County, Ohio for $1,276,169. Peffley attempted to assist victims of the Ponzi scheme by contacting news organizations and completing a victim impact statement. Peffley never gave any investment advice to the Plaintiffs in this lawsuit. He had spent over $100,000 to defend himself in this lawsuit.

{¶ 46} Robert Hanseman, an attorney, testified last at the trial. Trial Tr. 963-974. In November 2014, while employed as an attorney for a law firm in Dayton, Hanseman was quoted in a Dayton Daily News article as saying, "Anytime anyone guarantees a return, that's a danger sign." Hanseman testified that this quote needed clarification. According to Hanseman, the promise of "an unduly high-rate risk of return" is more of an issue. On October 15, 2014, Hanseman filed an involuntary bankruptcy proceeding against Apostelos in the United States Bankruptcy Court in Dayton, Ohio on behalf of Gloria Cruz, Joseph Mullane, and Rafael Cruz (the father). All three of these clients had obtained default judgments against Apostelos in the Warren County Court of Common Pleas. In the filing, Hanseman also directed the Bankruptcy Court's attention to the judgment Peffley had obtained against Apostelos.

{¶ 47} At the conclusion of the trial, the jury found that the Plaintiffs had suffered the following net losses from investing in the Ponzi scheme: the Estate of Rafael M. Cruz, Sr. ($1,960,688); Rafael F. Cruz, Jr. ($647,009); Gloria Cruz ($290,000); Joseph Mullane ($242,500); Carolyn Hedderly f.k.a. Harvey ($235,262); Kristen Harvey ($281,693); the Estate of Steve Harvey ($1,392,105); John and Rebecca Riccobono ($330,000); Michael Harvey ($234,678); Andrew White ($188,344); and John Goodman ($350,000). The jury

returned verdicts in favor of all 12 Plaintiffs for the following: $192,050 against Chad Leopard, $169,500 against Joe Leopard, and $35,000 against Joe's Landscaping.[1]

{¶ 48} The trial court entered judgment in favor of the Plaintiffs against Defendants in the amounts reflected in the jury verdicts. Defendants filed a timely notice of appeal from the trial court's judgment.

I.      Plaintiffs' Claims Were Brought Within One Year of When the Fraudulent Transfers Were Discovered or Reasonably Could Have Been Discovered

{¶ 49} Defendants' first assignment of error states:

THE TRIAL COURT ERRED IN ITS SUMMARY JUDGMENT DECISIONS REGARDING PLAINTIFFS' COMPLIANCE WITH THE STATUTE OF LIMITATIONS FOR FRAUDULENT TRANSFER CLAIMS, SET FORTH IN R.C. § 1336.09(A).

{¶ 50} This assignment of error addresses the trial court's summary judgment ruling that Plaintiffs had filed their claims under the Ohio Uniform Fraudulent Transfer Act within the applicable statute of limitations.

{¶ 51} Appellate review of a trial court's ruling on a summary judgment motion is de novo. *Schroeder v. Henness*, 2d Dist. Miami No. 2012-CA-18, 2013-Ohio-2767, ¶ 42. De novo review " 'means that this court uses the same standard that the trial court should have used, and we examine the evidence to determine whether as a matter of law no

---

[1] The jury also returned verdicts in favor of all 12 Plaintiffs against Defendants Daniel Peffley and Ruth Peters, but those Defendants were the subject of agreed orders of dismissal with prejudice prior to the entry of final judgment in this matter.

genuine issues exist for trial.' " *Riverside v. State*, 2016-Ohio-2881, 64 N.E.3d 504, ¶ 21 (2d Dist.), quoting *Brewer v. Cleveland City Schools Bd. of Edn.*, 122 Ohio App.3d 378, 383, 701 N.E.2d 1023 (8th Dist.1997). On such review, we do not grant deference to the trial court's determinations. *Powell v. Rion*, 2012-Ohio-2665, 972 N.E.2d 159, ¶ 6 (2d Dist.).

{¶ 52} Pursuant to Civ.R. 56(C), summary judgment is proper when (1) there is no genuine issue as to any material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds, after construing the evidence most strongly in favor of the nonmoving party, can only conclude adversely to that party. *Zivich v. Mentor Soccer Club, Inc.*, 82 Ohio St.3d 367, 369-370, 696 N.E.2d 201 (1998). The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Dresher v. Burt*, 75 Ohio St.3d 280, 292, 662 N.E.2d 264 (1996). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Id.* at 292-293.

{¶ 53} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleadings. *Id.* at 293. Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is a genuine issue of material fact for trial. *Id.* Throughout, the evidence must be construed in favor of the nonmoving party. *Id.*

{¶ 54} "Application of a statute of limitations presents a mixed question of law and

fact; when a cause of action accrues is a question of fact, but in the absence of a factual issue, application of the limitations period is a question of law." (Citation omitted.) *Schmitz v. NCAA*, 155 Ohio St.3d 389, 2018-Ohio-4391, 122 N.E.3d 80, ¶ 11.

{¶ 55} Ohio's Uniform Fraudulent Transfer Act provides for a four-year statute of limitations, with a one-year discovery rule. R.C. 1336.04(A)(1) provides: "A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; * * *." Due to their nature, all Ponzi scheme transfers are considered to be made with actual intent to hinder, delay, or defraud its creditors. *In re Ramirez Rodriguez*, 209 B.R. 424, 433 (Bankr.S.D.Tex.1997), citing a collection of cases.

{¶ 56} Further, R.C. 1336.09 provides, in part:

A claim for relief with respect to a transfer or an obligation that is fraudulent under section 1336.04 or 1336.05 of the Revised Code is extinguished unless an action is brought in accordance with one of the following:

(A) If the transfer or obligation is fraudulent under division (A)(1) of section 1336.04 of the Revised Code, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the

claimant[.]

{¶ 57} In this first assignment of error, Defendants contend that the four-year statute of limitations for fraudulent transfer claims expired well before Plaintiffs commenced their action. Further, Defendants argue the one-year discovery period provided for in R.C. 1336.09(A) began in 2014 when the transfers and their fraudulent nature were discoverable by the Plaintiffs or their counsel through Apostelos' involuntary bankruptcy. Appellants' Brief, p. 13. According to Defendants, "having acknowledged that [Plaintiffs] not only had access to, but in fact had, the banks, account names, and account numbers through which Apostelos ran his Ponzi scheme as early as November 18, 2014, it simply defies logic to argue that they could not reasonably discovery the transfers to the [Defendants] and their fraudulent nature until 2018." *Id.* at 16. Further, Defendants contend that Plaintiffs should have asked an associate of Apostelos for the names of the net-winners from the scheme well before 2018.

{¶ 58} Plaintiffs counter that their fraudulent transfer claims were the property of the bankruptcy estate until that bankruptcy case was dismissed in July 2018. Thus, if the Plaintiffs had any obligation to investigate fraudulent transfer claims against Defendants, it could not have arisen until July 2018, and Plaintiffs sued Defendants on November 5, 2018, well within the one-year discovery period. Appellees' Brief, p. 16. Plaintiffs also note that even if Ohio law obligated Defendants to investigate fraudulent transfer claims against Defendants before July 2018, Plaintiffs would not have been more successful than the bankruptcy trustee, which failed to obtain the records necessary to identify the fraudulent transfers. *Id.*

{¶ 59} The trial court agreed with the Plaintiffs. In particular, the trial court found:

It is reasonable to conclude that Plaintiffs knew a Ponzi scheme [may well have] been operated by Apostelos, but they did not know the transferees and the transfers. To understand who was a net-winner a great deal of information would have been necessary. The facts indicate all that information would not likely have been discovered by Plaintiffs by pursuing the means suggested by Defendants.

The law and the statute do not commence to run until the Plaintiffs know the fraudulent nature of the transfers. The Plaintiffs have to know both the fraudulent nature and the transfers. As indicated, they may have become aware of the transfer and later learned of its fraudulent nature. Or, one may reasonably deduce that an individual is engaging in fraudulent conduct, but not know of the transfer. There has to be unity. The aggrieved party has to know both before the one (1) year begins to run.

There is little doubt the aggrieved party must make reasonable inquiry, but that inquiry must be likely to provide specific information that would allow the recipient to file a bona-fide cause of action against a probable Defendant.

The court does not agree that filing subpoenas against the four (4) banks, disclosed by the Chapter 7 Trustee, was likely to disclose all the transfers, the transferees and the fraudulent nature of the transfers. The Trustee was not having success obtaining information that was

comprehensive and detailed. The Trustee had the power of the court and was having little success. The criminal law enforcement agencies were resisting. The primary actor, Apostelos, was uncooperative and was somewhat protected because of his right to remain silent. The banks would have resisted during 2014, 2015, 2016 and 2017 before the actual guilty plea.

The post judgment execution would have not been successful. It would have been a vain and unproductive act given the situation for Apostelos. Pre-suit discovery is not an unreasonable avenue to pursue, but there is nothing to suggest the banks would have cooperated prior to early 2018.

Decision Granting Plaintiff's Motion for Summary Judgment Finding Plaintiffs Timely Filed Their Claims (Nov. 19, 2021), p. 4-5.

{¶ 60} Defendants and Plaintiffs cite *In re Fair Finance Co.*, 834 F.3d 651 (6th Cir.2016), in support of their respective positions in this assignment of error. In that case, two individuals purchased a financial services company in Northeast Ohio and used it as a front for a Ponzi scheme, the proceeds of which were used to fund the two operators' extravagant lifestyles and various struggling business ventures. After the Ponzi scheme collapsed, the two operators and their chief financial officer were indicted for wire fraud, securities fraud, and conspiracy. The financial services company entered involuntary bankruptcy, and the Chapter 7 trustee brought several adversarial proceedings to recover on behalf of the company's estate and, by extension, the Ponzi scheme's unwitting

investors.   *Id.* at 656.

**{¶ 61}** The collapse of the Ponzi scheme in *Fair Finance* was accelerated by an FBI raid of the headquarters of the financial services company run by the operators of the Ponzi scheme.   The defendant, Textron, argued that the fraudulent transfer claims raised by the trustee were barred by Ohio's statute of limitations.   The parties agreed that the only way the claims would be timely was if they fell within the provisions of Ohio's fraudulent transfer statute's one-year discovery rule.   But the parties disagreed as to whether, for purposes of Ohio's fraudulent transfer statute, discovery occurred when the transfer was discoverable or when the transfer's fraudulent nature was discoverable.   *Id.* at 670-671.

**{¶ 62}**   The Sixth Circuit concluded that both discoveries were necessary to start the clock ticking on the one-year period:

> Throughout each application of the discovery rule, the crux of the inquiry was not at what point in time the defendant engaged in the allegedly wrongful conduct but at what point in time the plaintiff possessed or should have possessed, upon the exercise of reasonable diligence, "actual knowledge not just that [she] has been injured but also that the injury was caused by the conduct of the defendant."   * * *   Were we to adopt the interpretation offered by Textron in this case, that the Ohio UFTA's discovery rule begins to run when a plaintiff discovers, or upon the exercise of reasonable diligence, could have discovered the mere existence of the transfer, we would be adopting an application of the discovery rule that is in

tension with Ohio's broader statute of limitations and discovery rule jurisprudence— jurisprudence that the Commissioners were aware of when adopting the UFTA. * * * Rather, Ohio precedent weighs in favor of our conclusion that § 1336.09(A)'s one-year discovery period begins to run when a plaintiff discovers or, upon the exercise of reasonable diligence, could have discovered the transfer and its fraudulent nature. This is because, absent requiring the actual or constructive discovery of a transfer's fraudulent nature, application of the discovery rule would continue to "lead to the unconscionable result that the injured party's right to recovery c[ould] be barred by the statute of limitations before he is even aware of its existence."   * * *

(Citations omitted.)   *Fair Finance.* at 672-673.

**{¶ 63}** We agree with the trial court and the *Fair Finance* court that Plaintiffs needed to know of both the transfers and their likely fraudulent nature before the one-year period began to run.   It became clear to everyone in the fall of 2014 that Apostelos was involved in wrongdoing.   The FBI raid on his offices, the stories in the news, Apostelos' arrest, and the lawsuits being filed against Apostelos, including an involuntary bankruptcy proceeding, should have made a reasonable person aware that they had been defrauded by Apostelos and his related entities.   Therefore, at that point, Plaintiffs should have known that any transfers of which they were aware between Apostelos and any other person or entity were fraudulent.   However, for the one-year period to begin to run, the Plaintiffs also had to be aware of the actual transfers that occurred between Apostelos

(and his related entities) and the transferees. While all the Plaintiffs would have been aware as of the fall of 2014 of their own transfers involving Apostelos, they would not necessarily have been aware of all the other transfers involving Apostelos and other transferees.

{¶ 64} In the *Fair Finance* case, the plaintiffs should have been aware of the transfer at issue as early as 2004 when it was made part of the public record in offering circulars filed with the Ohio Division of Securities. In that case, the transfer was known first, and then the fraudulent nature of the transaction was discovered five years later when the FBI raided the debtor's offices and the Ponzi scheme was revealed. The opposite occurred in the Apostelos Ponzi scheme. Plaintiffs discovered the wrongdoing of Apostelos before they discovered the actual transfers involving Defendants.

{¶ 65} The question becomes when the Plaintiffs discovered the actual transfers or should have discovered the actual transfers. It appears to be undisputed that the Plaintiffs did not actually discover the transfers to Defendants until early 2018, within one year of when they filed the lawsuit. But that does not end our inquiry, because the statute of limitations would have expired if they should have discovered the transfers more than one year before filing the lawsuit.

{¶ 66} The involuntary bankruptcy case of Apostelos began in the fall of 2014. Once a debtor files for bankruptcy, only the bankruptcy trustee may prosecute a fraudulent transfer action. *William E. Weaner & Assocs., LLC v. 369 West First, LLC*, 2d Dist. Montgomery No. 28399, 2020-Ohio-48, ¶ 94, citing *In re Manton*, 585 B.R. 630, 635 (Bankr.N.D.Ga.2018). This is because "any property that is recoverable as a result of a

transfer that is voidable by an unsecured creditor becomes property of the estate." *In re Manton* at 635. Therefore, "the fraudulent transfer action itself is a claim of the estate." *Id.* "Furthermore, '[p]roperty of the estate * * * remains property of the estate and protected by the automatic stay until either the property is distributed, abandoned, or the case is closed.' " *369 West First* at ¶ 97, quoting *In re Manton* at 639.

{¶ 67} The Apostelos bankruptcy case was open for over three years. During this time, the Chapter 7 Trustee and the U.S. Trustee were unable to gather enough relevant information to pursue the fraudulent transfer claims against the net-winners. According to the evidence presented to the trial court in the motion for summary judgment briefing, the trustees had the names of the entities used by Apostelos in the Ponzi scheme and a list of the bank account numbers used in the furtherance of the Ponzi scheme. But the trustees did not have a list of the fraudulent transfers or the identities of the net-winners who were on the other side of the fraudulent transfers with Apostelos and his associated entities. Defendants argue that the information in the hands of the trustees was sufficient to have allowed both the trustee and the Plaintiffs to fill in the missing information if they had exercised reasonable diligence. We do not agree.

{¶ 68} The evidence presented to the trial court established that Plaintiffs did not have the identities of the net-winners or the transfers involving these net-winners until 2018. Further, there was no evidence to establish that this information should have been obtained before that time by Plaintiffs. Rather, Plaintiffs provided sufficient evidence to the trial court that they had made reasonable efforts in the pursuit of their claims and that other potential avenues to get this information earlier would have been futile, as

evidenced by the inability of both the U.S. Trustee and the Chapter 7 Trustee to get the requisite information during the over three years of the bankruptcy proceeding. According to evidence submitted by Plaintiffs in their summary judgment motion, the Chapter 7 Trustee filed ten motions for extensions of time, citing Apostelos' assertion of his Fifth Amendment rights and lack of cooperation or compliance with the court's orders, as well as the federal government's refusal to turn over relevant documents seized in the criminal case. The Chapter 7 Trustee detailed his attempts to obtain documents and records through discussions with the federal government, discovery requests to Apostelos' alleged co-conspirators, and seeking to appear in the civil forfeiture proceedings against Apostelos. Similarly, the U.S. Trustee explained the difficulties in getting the information requested from Apostelos. In February 2018, the trustees announced their intention to dismiss the bankruptcy case.

{¶ 69} In opposition to Plaintiffs' motion for summary judgment, Defendants contended that all Plaintiffs had to do was subpoena the banks and they would have received all the information they needed to identify the relevant transfers and transferees. But this argument by Defendants ignores the fact that there was an automatic stay in place during the pendency of the bankruptcy case and Apostelos was not convicted until 2017. Further, until February 2018, it was reasonable to presume that any fraudulent transfers successfully pursued by the trustees would benefit Plaintiffs in this action. But in February 2018 it became clear that this was not going to happen. Plaintiffs then pursued other avenues to seek the information, which eventually worked later in 2018. Plaintiffs filed suit well within one year of when they discovered the transfers that were

fraudulent in nature, as well as the identities of the transferees. Therefore, the trial court did not err in granting summary judgment to Plaintiffs on the issue of whether they brought their fraudulent transfer claims within the statute of limitations set forth in R.C. 1336.09(A).

{¶ 70} The first assignment of error is overruled.

II. Plaintiffs Had Standing to Sue Under the Ohio Uniform Fraudulent Transfer Act

{¶ 71} Defendants' second assignment of error states:

THE TRIAL COURT ERRED IN DENYING SUMMARY JUDGMENT

BASED ON LACK OF STANDING AND REAL PARTY IN INTEREST.

{¶ 72} Defendants filed a motion for summary judgment asking the trial court to find that Plaintiffs did not have standing to sue Defendants under the Ohio Uniform Fraudulent Transfer Act. The trial court overruled the motion, finding that Plaintiffs had standing to bring their claims under the Ohio Uniform Fraudulent Transfer Act even though such claims were at one time part of Apostelos' bankruptcy estate. Defendants challenge this summary judgment ruling, framing their second assignment of error as follows: "[W]hen a debtor fails to disclose potential claims against third parties as assets of the bankruptcy estate—thus preventing them from being administered—does a subsequent dismissal of the bankruptcy estate re-vest those claims in the party who held them pre-bankruptcy (per 11 U.S.C. § 349) or do they remain the province of the bankruptcy trustee (per 11 U.S.C. § 554)?" Appellants' Brief, p. 17. Defendants contend that the debtor's failure to disclose the claims in the bankruptcy case meant that the trustee maintained sole standing to pursue them under 11 U.S.C. § 554, even after

the bankruptcy case was dismissed.   Appellants' Brief, p. 17, citing *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54-55 (Bankr.S.D.N.Y.1999).

{¶ 73} Plaintiffs counter that the United States Supreme Court has made it clear that "once a bankruptcy case is dismissed, the bankruptcy estate disappears and the parties return to their pre-bankruptcy positions."   Appellees' Brief, p. 22, citing *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 466, 137 S.Ct. 973, 197 L.Ed.2d 398 (2017). Further, Plaintiffs note that *Kunica*, the case relied on by Defendants, has been widely discredited and is distinguishable from Defendants' position.   According to Plaintiffs, "[t]he critical distinction to *Kunica* is the dismissal in that case occurred after the debtor had:  filed a schedule of assets, filed a reorganization plan, filed amended disclosure statements, and participated in a voluntary bankruptcy proceeding."   Appellees' Brief, p. 24, citing *Kunica* at 50.   Plaintiffs then cite to a subsequent United States Second District Court of Appeals decision that rejected *Kunica*.   Appellees' Brief, p. 24-25, citing *Crawford v. Franklin Credit Mgmt.*, 758 F.3d 473 (2d Cir.2014).

{¶ 74} Before addressing the federal bankruptcy code provisions and federal cases cited by the parties, it is important to review the relevant provisions in Ohio's Uniform Fraudulent Transfer Act.   R.C. 1336.07 sets forth the remedies of a creditor, providing, in part:

> (A) In an action for relief arising out of a transfer or an obligation that is fraudulent under section 1336.04 or 1336.05 of the Revised Code, a * * * creditor, subject to the limitations in section 1336.08 of the Revised Code, may obtain one of the following:

(1) Avoidance of the transfer or obligation to the extent necessary to satisfy the claim of the creditor;

(2) An attachment or garnishment against the asset transferred or other property of the transferee in accordance with Chapters 2715. and 2716. of the Revised Code;

(3) Subject to the applicable principles of equity and in accordance with the Rules of Civil Procedure, any of the following:

(a) An injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(b) Appointment of a receiver to take charge of the asset transferred or of other property of the transferee;

(c) Any other relief that the circumstances may require.

**{¶ 75}** Under the plain language of the Ohio Uniform Fraudulent Transfer Act, net-losers from the Ponzi scheme would have standing to sue Apostelos and net-winners from the Ponzi scheme to obtain relief related to the fraudulent transfers between Apostelos and the net-winners. However, while Apostelos' involuntary bankruptcy proceeding was pending, the bankruptcy trustee was the sole entity that could bring claims under the Ohio Uniform Fraudulent Transfer Act against those individuals who had received money from Apostelos as part of his Ponzi scheme. *William E. Weaner & Assocs., LLC v. 369 W. First, LLC*, 2d Dist. Montgomery No. 28399, 2020-Ohio-48, ¶ 94, citing *In re Manton*, 585 B.R. 630, 635 (Bankr.N.D.Ga.2018). But the Trustee was unable to gather sufficient information to pursue such claims and chose to close the

bankruptcy proceedings without pursuing those claims. The issue then becomes what happens to the potential claims under the Ohio Uniform Fraudulent Transfer Act once the bankruptcy proceedings were dismissed.

{¶ 76} 11 U.S.C. Section 349(b)(3) states: "Unless the court, for cause, orders otherwise, a dismissal of a case other than under section 742 of this title revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title." Further, 11 U.S.C. Section 554(c) states: "Unless the court orders otherwise, any property scheduled under section 521(a)(1) of this title not otherwise administered at the time of the closing of a case is abandoned to the debtor and administered for purposes of section 350 of this title." The parties disagree over the effect of these bankruptcy code provisions and whether one trumps the other.

{¶ 77} Defendants cite *Kunica*, 233 B.R. 46, in support of their proposition that Plaintiffs lack standing to sue in this matter, because the claims under the Ohio Uniform Fraudulent Transfer Act remain with the trustee as part of the bankruptcy estate. In *Kunica*, Sci-O-Tech filed a voluntary Chapter 11 bankruptcy petition. At that time, Kunica, Ltd. owned 100% of the outstanding shares of common stock of Sci-O-Tech and Richard Kunica was the President of both Kunica, Ltd. and Sci-O-Tech. In its plan for reorganization, Sci-O-Tech expressly reserved the right to initiate litigation with respect to any claim or cause of action maintainable by Sci-O-Tech. At the same time, Sci-O-Tech issued a disclosure statement noting that litigation against third parties who defaulted on commitments to lend or invest in it was quite likely to occur. *Id.* at 49-51.

{¶ 78} Sci-O-Tech executed an agreement for the sale of substantially all its assets to a company called Lumex. Certain claims or causes of actions against third parties were not included in the sale of assets. The bankruptcy court approved the sale to Lumex. Four months later, the bankruptcy trustee moved to dismiss Sci-O-Tech's bankruptcy case or convert it to one under Chapter 7 of the Bankruptcy Code. Sci-O-Tech joined in the Trustee's motion but requested that the bankruptcy court dismiss its case rather than convert it to Chapter 7. The bankruptcy court dismissed Sci-O-Tech's case. A few months later, Sci-O-Tech assigned claims and causes of action to Richard Kunica in consideration of $10 and "other good and valuable consideration." Kunica then sued two defendants pursuant to these assigned claims. *Id.* at 51-52.

{¶ 79} The defendants contended that Kunica lacked standing to assert Sci-O-Tech's claims, because Sci-O-Tech failed to disclose the existence and value of those claims to its creditors and the bankruptcy court in its schedules or at any time during the pendency of its Chapter 11 case. *Id.* at 52. The district court agreed with the defendants. The court noted that "[a] basic tenet of bankruptcy law is that all assets of the debtor, including all pre-petition causes of action belonging to the debtor, are assets of the bankruptcy estate that must be scheduled for the benefit of creditors." (Citations omitted.) *Id.* According to the court, "[b]ecause undisclosed claims are not 'dealt with' by the plan, they do not revert to the debtor free of the claims of the creditors." *Id.* The court also noted that property that is scheduled pursuant to 11 U.S.C. Section 521(a)(1), but not administered by the plan, is abandoned to the debtor by operation of law at the close of the bankruptcy case. *Id.*, citing 11 U.S.C. Section 554(c). " ' By contrast,

property that is not formally scheduled is not abandoned and therefore remains part of the estate.' " *Id.*, citing 11 U.S.C. Section 554(d) and other cases.

**{¶ 80}** The *Kunica* court reasoned that "[a] dismissal of a bankruptcy case, however, as opposed to a discharge, should not provide a debtor with a safe harbor against lack of standing to pursue causes of action that were not properly disclosed. * * * [T]he key issue in this case is not dismissal nor discharge, but disclosure." *Id.* at 53-54. The court then concluded:

> Given the critical importance of full and candid disclosure in Chapter 11 proceedings, it cannot be that the requirement of adequate disclosure evaporates because a reversion of property is obtained by dismissal, under § 349, as opposed to abandonment under § 554. To hold otherwise would be to encourage a procedural end-run around the disclosure requirements, thereby rewarding parties that fail to comply with the directive of § 1125. Thus, a bankruptcy discharge is not a prerequisite to a finding that a debtor lacks standing to assert undisclosed claims post-bankruptcy.

*Id.* at 54-55.

**{¶ 81}** Based on this analysis, the *Kunica* court ruled that "[t]hese alleged disclosures, both individually and in the aggregate are insufficient as a matter of law. Accordingly, given Sci-O-Tech's failure to adequately disclose the existence and value of the Claims, it does not have standing to assert them here. As an assignee of Sci-O-Tech's Claims, Kunica has no greater rights or standing than would Sci-O-Tech." (Citation omitted.) *Id.* at 57.

{¶ 82} Fifteen years later, in *Crawford v. Franklin Credit Mgt. Corp.*, 758 F.3d 473 (2d Cir.2014), the Second Circuit addressed the interplay between 11 U.S.C. Sections 349 and 554. The Second Circuit was reviewing the district court's finding that plaintiffs lacked standing, which was based on the *Kunica* decision. The Second Circuit rejected the district court's reliance on *Kunica*, holding:

We conclude that Crawford has standing to pursue her present claims because her 2006 Petition was dismissed. Although the district court stated that Crawford lacked standing because "unscheduled assets can only re-vest in the debtor by the operation of law," * * * we are persuaded that, because Crawford's 2006 bankruptcy proceeding was dismissed, all of Crawford's assets were indeed revested in her by operation of law. Section 349 of the Code provides, with an exception not relevant here, that unless the bankruptcy court for cause orders otherwise, "a dismissal of a case ... revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case," 11 U.S.C. § 349(b)(3) * * * .

The district court viewed § 349 as overridden by § 554 of the Code, titled "Abandonment of property of the estate." * * *

We cannot view § 554(d) as overriding § 349. As noted above, § 541(a)(1) provides that the debtor's assets become property of the estate "as of the commencement" of the bankruptcy case; this applies whether or not the assets are listed in the required § 521(a)(1) schedule[.] * * * The

provision in § 349 for the revesting of assets is similarly broad: It makes no distinction between those that were listed in the debtor's schedule of assets and those that were not; what is revested in the immediately pre-petition owner or owners is "the property of the estate." 11 U.S.C. § 349(b)(3). The legislative history makes clear that Congress intended that a dismissal would undo the bankruptcy case[.] * * * Since the dismissal undoes the bankruptcy case, there is, upon dismissal, no longer any bankruptcy estate; and hence, there is no longer any property of the estate. * * *

As there no longer remains any "property of the estate" after a case has been dismissed, § 554 has no applicability after a dismissal. * * *

We are not persuaded to reach the opposite conclusion by the opinion of the district court in *Kunica*, which dealt with a debtor that, despite the dismissal, received relief that was tantamount to a discharge, and which is, in any event, not binding on us. * * *

In sum, when Crawford's First Bankruptcy case was dismissed, the property of the bankruptcy estate revested in her by operation of law. To the extent that the district court declined to apply § 349 on the basis that the equities did not favor Crawford, that rationale bespeaks estoppel rather than lack of standing. We conclude that, by application of § 349, Crawford has standing to pursue her present claims.

*Id.* at 484-485.

{¶ 83} We agree with the Second Circuit that 11 U.S.C. Section 349 revests all the property of the bankruptcy estate in its prior owners. When a trustee asks to be discharged from further duties and the case is closed, the fraudulent transfer claims cease to be property of the bankruptcy estate. *William E. Weaner & Assocs.,* 2d Dist. Montgomery No. 28399, 2020-Ohio-48, at ¶ 102. As such, Plaintiffs had standing to bring claims pursuant to Ohio's Uniform Fraudulent Transfer Act if they could establish that they were net-losers under the Ponzi scheme and that the parties they were suing were net-winners. Therefore, the trial court did not err in denying Defendants' motion for summary judgment on the standing issue.

{¶ 84} The second assignment of error is overruled.

III. The Doctrine of Mitigation of Damages Does Not Require Plaintiffs to Sue Every Net-Winner

{¶ 85} Defendants' third assignment of error states:

THE JURY VERDICTS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ON THE AFFIRMATIVE DEFENSE OF MITIGATION OF DAMAGES.

{¶ 86} In their final three assignments of error, Defendants challenge the judgment as being against the manifest weight of the evidence. Appellants cite the appropriate standard that courts of appeals must apply when reviewing manifest weight of the evidence arguments. Appellants make no mention of the sufficiency of the evidence standard and do not raise a sufficiency of the evidence argument in this assignment of

error. But it is important for us to review these two concepts to determine what relief, if any, Defendants are entitled to under this assignment of error.

{¶ 87} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In *Thompkins*, the Ohio Supreme Court described "sufficiency" as:

> a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Id.* at 386, quoting *Black's Law Dictionary* 1433 (6th Ed.1990).

{¶ 88} "[E]ven if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing*

*belief.*"

(Emphasis sic.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶ 89}** Under the manifest weight of the evidence standard, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986), citing *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). An appellate court that overturns a jury verdict as against the manifest weight of the evidence acts in effect as a "thirteenth juror," setting aside the resolution of testimony and evidence as found by the trier of fact. *Thompkins* at 387. Notably, such a reversal is reserved for the exceptional case in which the evidence presented weighs heavily in favor of the party against whom the jury verdict was levied. *Otten* at 340.

**{¶ 90}** Although the standards enunciated in *Thompkins* were applied in a criminal setting, the Ohio Supreme Court has made it clear that the sufficiency of the evidence and the manifest weight standards also apply in the civil setting. "In a civil case, in which the burden of persuasion is only by a preponderance of the evidence, rather than beyond a reasonable doubt, evidence must still exist on each element (sufficiency) and the evidence on each element must satisfy the burden of persuasion (weight)." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19.

**{¶ 91}** In addition to the differing standards used in the sufficiency and manifest

weight analyses, another key distinction between the two involves how many appellate court judges must agree to order the appropriate relief. To reverse a judgment based on sufficiency of the evidence, only a majority of the appellate panel is required. However, "[n]o judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three judges hearing the cause." Ohio Constitution, Article IV, Section 3(B)(3). Therefore, "unanimous panels are needed to reverse judgments based on civil jury verdicts on grounds that they are against the manifest weight of the evidence." *Eastley* at ¶ 7, citing *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, 874 N.E.2d 1198.

{¶ 92} Another notable distinction between sufficiency and manifest weight analyses involves what relief an appellate court may grant if it finds that a judgment is not supported by sufficient evidence or is against the manifest weight of the evidence. This is most easily understood in a criminal setting where the double jeopardy clause precludes retrial if the reversal by the appellate court is based upon a finding that the evidence was legally insufficient to support the conviction. *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 47, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). If the reversal is based on a manifest weight analysis, however, the double jeopardy clause does not preclude retrial of a defendant. In the civil setting, this has resulted in a similar dichotomy. If at least two members of the appellate panel find that the judgment was not supported by sufficient evidence, then the court may reverse the judgment and enter the judgment that should have been entered. But if the appellate panel unanimously finds that the judgment was against the manifest weight of the evidence, then the appellate

court may not enter final judgment on the weight of the evidence but must instead remand the case for a new trial. *Hanna v. Wagner*, 39 Ohio St.2d 64, 66, 313 N.E.2d 842 (1974); *Bown & Sons v. Honabarger*, 171 Ohio St. 247, 251-252, 168 N.E.2d 880 (1960).

{¶ 93} In their final three assignments of error, Defendants contend that the judgment was against the manifest weight of the evidence. No separate argument is made that the judgment was not supported by sufficient evidence, and we will not rewrite Defendants' assignments of error to include such an argument. Therefore, if Defendants establish that the judgment was against the manifest weight of the evidence, then we are limited to reversing and remanding for a new trial rather than entering judgment for Defendants.

{¶ 94} In their third assignment of error, Defendants challenge the judgment as being against the manifest weight of the evidence on the affirmative defense of mitigation of damages. As a general rule, "an injured party has a duty to mitigate and may not recover for damages that could reasonably have been avoided." *Chicago Title Ins. Co. v. Huntington Natl. Bank*, 87 Ohio St.3d 270, 276, 719 N.E.2d 955 (1999), citing *S & D Mechanical Contrs., Inc. v. Enting Water Conditioning Sys., Inc.*, 71 Ohio App.3d 228, 593 N.E.2d 354 (2d Dist.1991). However, the obligation to mitigate is not unlimited; the party is not expected to incur extraordinary expenses or to do what is unreasonable or impracticable. *Lucky Discount Lumber Co., v. Machine Tools of Am.*, 181 Ohio App.3d 64, 2009-Ohio-534, ¶ 12 (2d Dist.). In mitigating damages, an injured party must use only ordinary and reasonable effort to avoid or lessen the damages. *Abroms v. Synergy Bldg. Sys.*, 2d Dist. Montgomery No. 23944, 2011-Ohio-2180, ¶ 58, citing *Lucky Discount*

*Lumber* at ¶ 12.   A defendant will not be held responsible for those damages that plaintiff could have avoided with reasonable effort and without undue risk or expense.   *Kanistros v. Holeman*, 2d Dist. Montgomery No. 20528, 2005-Ohio-660, ¶ 36.   The defendant against whom the claim is made has the burden to demonstrate the injured plaintiff's failure to mitigate damages.   *Id.* at ¶ 37.

{¶ 95} The trial court gave the following instruction to the jury on the mitigation of damages issue:

> The duty to mitigate is an affirmative defense.   If the defendants proved by a preponderance of the evidence that a plaintiff did not use reasonable diligence or make reasonable efforts under the fact and circumstance in evidence to avoid loss or lessen damages caused by Apostelos' fraud, you should not allow damages that could have been avoided by the exercise of reasonable diligence or reasonable efforts to avoid loss.   The plaintiff, however, is not required to take measures that would involve undue risks, burden or humiliation.

Charge to the Jury, p. 12-13.   *See also* Trial Tr. 1152.

{¶ 96} Defendants contend that "[t]he record at trial was replete with evidence that showed the Plaintiffs' failure to mitigate their damages by choosing not to sue certain net winners."   Appellants' Brief, p. 19.   According to Defendants, "[f]iling suit against 77 of the 208 individuals who profited at the end of the Apostelos' scheme is not a reasonable mitigation.   In fact, it isn't mitigation at all."   *Id.* at 20.   Further, Defendants believe the Plaintiffs "had a duty to lessen not only their damages, but the 'cost' to the [Defendants]."

Reply Brief, p. 11. Defendants note that "[Plaintiffs] left $2,568.147.51 on the table by not pursuing all net-winners. Had the [Plaintiffs] attempted to collect from all net-winners, it is clear that the [Defendants'] 'cost' would have been lessened as the [Plaintiffs] could have recovered from additional parties." *Id.* In sum, Defendants believe that Plaintiffs' "choice to file suit against only select individuals was improper and a failure to mitigate their damages." *Id.* at 10.

**{¶ 97}** Plaintiffs respond that the failure to mitigate damages is an affirmative defense, the burden of which lies with Defendants. Appellees' Brief, p. 26. Plaintiffs contend that "mitigation looks at whether a plaintiff could avoid damages in the first place, not spread recovery of damages among more defendants." *Id.* at 27. According to Plaintiffs, "Ohio law provides mechanisms for spreading liability among responsible defendants and if [Defendants] believed any such mechanism applied here they were free to pursue it." *Id.* at 28.

**{¶ 98}** Ultimately, Defendants take issue with Plaintiffs' decision to pick and choose which net-winners to sue rather than just suing all the net-winners. But typically, it is a plaintiff's choice who to sue and not to sue. Moreover, we are not convinced this choice is relevant to the question of whether Plaintiffs took the reasonable, adequate steps to mitigate their damages. Indeed, we fail to see how suing additional parties would change the amount of damages Plaintiffs previously suffered because of the Ponzi scheme or change the amount by which Defendants were net-winners under the Ponzi scheme.

**{¶ 99}** We do not agree that Plaintiffs' decision not to sue every net-winner

established that Plaintiffs had failed to mitigate their damages. Although suing net-winners is a way to collect damages, suing more net-winners would not reduce the amount of damages that Plaintiffs suffered because of the fraudulent transactions. At the same time, we acknowledge Defendants' frustration that they were sued when many other net-winners were not sued. Further, "[w]e are aware that it may create a significant hardship when an innocent investor * * * is informed that he must disgorge profits he earned innocently, often years after the money has been received and spent. Nevertheless, courts have long held that [it] is more equitable to attempt to distribute all recoverable assets among the defrauded investors who did not recover their initial investments rather than to allow the losses to rest where they fell." *Donell v. Kowell*, 533 F.3d 762, 776 (9th Cir.2008), citing *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.1995). Indeed, the use of Ohio's Uniform Fraudulent Transfer Act may be the best available means to attempt to "mitigate" the losses suffered by innocent net-losers. *Kowell* at 776.

{¶ 100} The third assignment of error is overruled.


IV. The Plaintiffs Were Required to Show that They Invested in Good Faith in Order to Recover Monies from Net Winners

{¶ 101} Defendants' fourth assignment of error states:

THE JURY VERDICTS IN FAVOR OF NINE PLAINTIFFS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE ON THE ISSUE OF GOOD FAITH.

{¶ 102} Defendants note that the judgment against them was in favor of the

following 12 Plaintiffs: (1) the Estate of Rafael M. Cruz; (2) Gloria Cruz; (3) Rafael F. Cruz, Jr.; (4) Joe Mullane; (5) John Goodman; (6) the Estate of Steve Harvey; (7) Michael Harvey; (8) Carolyn Hedderly f/k/a Harvey; (9) Kristin Harvey; (10) John Riccobono; (11) Rebecca Riccobono; and (12) Andrew White. But out of these 12 Plaintiffs, only John Goodman, Michael Harvey, and Rafael Cruz, Jr. testified at the trial. According to Defendants, the nine Plaintiffs who did not testify at trial failed to establish that they had invested with Apostelos in good faith, and therefore they could not recover any judgment against Defendants.

{¶ 103} Plaintiffs counter that "[n]either the plain text of the statute nor the case law requires a plaintiff/creditor must, as a condition precedent, prove his or her own good faith to satisfy an [Ohio Uniform Fraudulent Transfer Act] claim." Appellees' Brief, p. 32. According to Plaintiffs, " 'good faith' arises only in the context of an affirmative defense for a transferee." *Id.* Further, Plaintiffs contend that the three Plaintiffs who testified at trial provided sufficient testimony to support a finding of good faith on the part of the nine Plaintiffs who did not testify at trial. *Id.* at 29.

{¶ 104} In its December 10, 2021 Decision, the trial court found that Plaintiffs had the burden of proof to show good faith as a condition precedent to recovery of restitution damages as alleged net-losers. Further, at trial, the jury was presented with the following instruction regarding Plaintiffs' duty to show good faith:

Each Plaintiff must also set forth prima facie evidence he or she invested with Apostelos in good faith. * * *

While there is no precise definition of "good faith," its existence

depends on whether the person receiving the transfers had information to put them on inquiry notice that the transferor may have had a fraudulent purpose. Whether a person is on inquiry notice of another's fraudulent intent depends on the standards, norms, practices, sophistication, and experience generally possessed by participants in that person's industry or class. A person acts in good faith if the weight of the evidence does not show the person knew or should have known of the fraudulent nature of another's activities.

If you decide any Plaintiff knew or should have known that Apostelos had fraudulent intent, or that the circumstances were such that would place a reasonable person on inquiry of Apostelos' fraudulent purposes such that had a diligent inquiry been performed the inquiry would have uncovered Apostelos' fraudulent purpose, then the Plaintiff cannot have taken the transfers in good faith.

Charge to the Jury, p. 7, 10.

**{¶ 105}** The good faith requirement at issue comes from the language contained in Ohio's Uniform Fraudulent Transfer Act. R.C. 1336.08(A) provides that: "A transfer or an obligation is not fraudulent under division (A)(1) of section 1336.04 of the Revised Code against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee." Further, the statute provides that judgment may be entered against either: "(a) The first transferee of the asset or the person for whose benefit the transfer was made; (b) Any subsequent transferee other than a

good faith transferee who took for value or from a subsequent transferee." R.C. 1336.01(B)(1).

{¶ 106} Typically, good faith is raised as a defense by a defendant in a Ponzi scheme case involving fraudulent transfer claims to show that he should at least receive credit for the amount he invested in the scheme against any amounts he received from the scheme. But we agree with the trial court that before Plaintiffs could recover money from Defendants, they also had to put forth evidence that they had invested with Apostelos in good faith. Otherwise, Plaintiffs could recover money even if Plaintiffs were aware that they were participating in a Ponzi scheme at the time they gave money to and received money from Apostelos. The same rationale for applying the good faith standard to defendants in fraudulent transfer act cases equally applies to plaintiffs seeking to recover monies in such cases. "Only innocent investors who reasonably believed that they were investing in a legitimate enterprise are entitled to claims for restitution." *In re Bernard L. Madoff Invest. Secs. LLC*, 445 B.R. 206, 225 (Bankr.S.D.N.Y. 2011). "Since investors in a Ponzi scheme are entitled to only an equitable right of repayment, there can be no legally enforceable debt if the investors acted in bad faith. Therefore, while innocent investors are entitled to restitution claims up to the amount of their principal, such is not the case when investors * * * are alleged to have had knowledge of, and played a part in, furthering the fraud." *Id.* at 226.

{¶ 107} As the Ninth Circuit explained in *Kowell*, 533 F.3d 762:

Under the actual fraud theory, the good faith losing investor is technically still liable even if his net transactions are negative, because even

payments that total less than the amount of that investor's initial outlay were made "[w]ith actual intent to hinder, delay or defraud [a] creditor of the debtor." * * * However, because of the "good faith" defense, that permits an innocent investor to retain funds up to the amount of the initial outlay, * * * the good faith investor with a net loss will not face any actual liability.

*Id.* at 771, fn. 4, citing California's version of the Uniform Fraudulent Transfer Act.

{¶ 108} Having established that the trial court did not err in requiring each Plaintiff to show that he or she had invested in good faith before he or she could recover a judgment against Defendants, the question becomes whether each Plaintiff did establish such good faith.

{¶ 109} "Good faith is essentially a weight of the evidence question." *E. Savings Bank v. Bucci*, 7th Dist. Mahoning No. 08 MA 28, 2008-Ohio-6363, ¶ 85. "The determination of a lack of good faith does not rely solely on actual intent but can involve an inquiry into the party's motive and purpose." *Id.*, citing *Castle Properties v. Lowe's Home Centers, Inc.*, 7th Dist. Mahoning No. 98 CA 185, 2000 WL 309395, *6 (March 20, 2000). "Although good faith generally denotes honesty of purpose and freedom from intention to defraud, the [factfinder] can consider evidence of what is reasonable in order to evaluate good faith and can evaluate any objective facts that contradict the suggestion of a subjectively honest purpose." *Id.*

{¶ 110} During the jury trial, Plaintiffs John Goodman, Rafael F. Cruz, and Mike Harvey testified regarding the issue of good faith. They provided sufficient testimony, if credited, for the jury to have made a finding that the three of them invested with Apostelos

in good faith.

{¶ 111} None of the other nine Plaintiffs, however, testified at trial. But the failure to testify did not necessarily preclude a finding of good faith if there was other evidence in the record upon which a reasonable jury could have relied to make a finding that the other nine Plaintiffs had invested in good faith. Rafael F. Cruz testified that he believed all those who invested with Apostelos invested in good faith. Such a blanket statement, without more, was not sufficient to establish good faith on the part of the nine Plaintiffs who did not testify, especially when Rafael did not give a factual basis for this belief. In other words, he needed to testify at least to his interactions with the other Plaintiffs that would lead him to believe that these Plaintiffs invested in good faith.

{¶ 112} Rafael testified that he introduced Apostelos to his family. According to Rafael, his father and his sister, Gloria Cruz, along with her husband, Joseph Mullane, all invested with Apostelos based on Rafael's recommendation. But no evidence was presented regarding what any of these parties had known about Apostelos, what information they had obtained during their interactions with Apostelos, or whether their decision to invest had been based solely on Rafael's recommendation. On the other hand, Rafael explained that there had been a tax problem that he, his father, and his sister knew about involving their father and Apostelos. Although Rafael testified that he, at the time, had not suspected any wrongdoing by Apostelos, there was no similar evidence in the record that his father and his sister had not suspected any wrongdoing. Further, Plaintiffs' expert, Soneed Kapila, testified that a 50% interest rate in a promissory note should be a red flag for an investor and that one of Gloria Cruz's promissory notes

with Apostelos included a 50% rate of interest. Given this evidence that may have put an investor on notice of potential wrongdoing, it was incumbent on Plaintiffs to submit evidence establishing that the nine non-testifying Plaintiffs had invested with Apostelos in good faith.

{¶ 113} Mike Harvey testified that he and Kristen Harvey met with Apostelos together and their meeting with Apostelos and an attorney had inspired confidence in Apostelos. Harvey testified that he had invested with Apostelos in good faith. When he found out that Apostelos' office had chains on its doors, Harvey immediately began crying and was devasted and he then told his wife. Harvey did note that their stockbroker may have warned his wife about rolling over an IRA, but Harvey testified that he did not suspect any wrongdoing from Apostelos until October 2014. Although Harvey presented testimony on which a jury could have found that he had acted in good faith, he did not provide evidence on which a jury could have found that his ex-wife or other family member invested in good faith. It was important to determine what facts each of the other family members had known, what interactions they had had with Apostelos, and whether they should have been on notice based on the information they knew or should have known. Similarly, the record lacks any basis on which a reasonable jury could have found that Plaintiffs John Riccobono, Rebecca Riccobono, and Andrew White had invested in good faith.

{¶ 114} We acknowledge that Ponzi schemes that last several years typically do so because the operators of the scheme were very skilled at deception. And it is tempting to assume that every investor was completely fooled to the point that they

invested in good faith. But there was evidence in the record that different investors had different interactions with Apostelos and had different information available to them that might have put an average investor on notice of potential wrongdoing. While it seems inconceivable that anyone would invest with someone with knowledge that they were dealing in a Ponzi scheme or a fraudulent transaction, the reality is that sometimes that does happen or, at least sometimes, investors gain enough information that should have put them on inquiry notice that they may have been involved in a fraudulent transaction. Therefore, it was important that the investors present some evidence that they had invested in good faith. Just as Defendants needed to show good faith, Plaintiffs did as well. The nine non-testifying Plaintiffs failed to do so. Therefore, to the extent that the judgment was in their favor, it was against the manifest weight of the evidence and must be vacated.

{¶ 115} Plaintiffs argue that this assignment of error should be overruled even if we were to conclude that the judgment for the nine non-testifying Plaintiffs was against the manifest weight of the evidence. According to Plaintiffs, the total amount of the judgment in favor of Plaintiffs Rafael Cruz, Jr., John Goodman, and Mike Harvey was still well above the amount by which Defendants were net-winners. Plaintiffs believe Defendants did not suffer any prejudice through this portion of the judgment, and therefore the assignment of error should be overruled. We do not agree. Apparently, Plaintiffs were to share the recoveries in this lawsuit pro-rata. Therefore, whether there were three winning Plaintiffs versus twelve winning Plaintiffs made a difference in the pro-rata share of each. Further, allowing nine Plaintiffs who did not show good faith to share

in the recovered winnings would be contrary to the law of restitution applied in Ponzi scheme and fraudulent transfer act cases. Just as Defendants had to show good faith to have their investments credited against the transfers received from Apostelos, Plaintiffs had to show good faith to get credit for their amounts invested. By not doing so, they could not establish a viable claim under the Ohio Uniform Fraudulent Transfer Act.

{¶ 116} Due to their failure to put forth evidence of good faith, the judgment will be reversed as against the manifest weight of the evidence to the extent that it found in favor of the following Plaintiffs: (1) the Estate of Rafael M. Cruz; (2) Gloria Cruz; (3) Joe Mullane; (4) the Estate of Steve Harvey; (5) Carolyn Hedderly f/k/a Harvey; (6) Kristin Harvey; (7) John Riccobono; (8) Rebecca Riccobono; and (9) Andrew White.

{¶ 117} The fourth assignment of error is sustained.


V.   The Jury's Decision to Not Credit Chad Leopard with a $25,000 Cash Investment Wad Not Against the Manifest Weight of the Evidence

{¶ 118} Appellants' fifth assignment of error states:

THE JURY VERDICT AGAINST CHAD LEOPARD WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 119} The jury returned a verdict in favor of Plaintiffs against Defendant Chad Leopard in the amount of $192,050. Chad contends that the jury impermissibly relied solely on the summary included in Kapila's expert report, which did not credit any cash payments by investors. Appellants' Brief, p. 24. According to Chad, no evidence was offered by Plaintiffs that he did not make a cash investment. On the other hand, Chad

testified at trial that he had made a $58,500 initial cash investment, and this testimony was supported by a ledger that Apostelos possessed. *Id.* at 23. Chad concedes that he testified on cross-examination at trial that he had previously testified at a deposition that his initial cash investment was $25,000. *Id.* But Chad points out that he testified that his first investment with Apostelos was in July 2013 when he physically met with Apostelos along with Joe Leopard. According to Chad, "[t]hat timeline corresponds directly with the timeline for Joe, who the parties stipulated invested in cash on July 1, 2013, on the recommendation of Chad." Reply Brief, p. 15, citing Stipulation #9.

{¶ 120} Further, Chad states that his Exhibit A at trial further evidenced financial transactions between he and Apostelos in July 2013 and that these documents were undisputed evidence. *Id.* Chad argues that, "[i]mportantly, at the trial, counsel for Plaintiffs did not object to the fact that Chad deposited at least some cash with Apostelos. The dispute at trial was over the amount." *Id.* at 24. He concludes that "[w]hether the jury found Chad credible or not, they should have never found that he failed to invest any cash with Apostelos." *Id.* at 15.

{¶ 121} Plaintiffs respond that the jury was free to disbelieve all or part of Chad's testimony. According to Plaintiffs, "[t]he parties did not dispute Chad invested $53,000 as supported by documentary evidence," but it "was Chad's burden to prove his cash investments" and "he offered only self-serving and contradictory testimony in support." Appellees' Brief, p. 34.

{¶ 122} Chad testified both in his deposition and at trial that he had made a cash investment during his first meeting with Apostelos. As Chad explained at trial, he had

previously testified at his deposition that he had invested $25,000 in cash with Apostelos at their first meeting. At the time of trial, however, Chad believed that he had invested $58,500 in cash with Apostelos at their first meeting. This change in testimony did not appear to be the result of an improved memory or an epiphany, but instead appeared to be the result of documentation kept by Apostelos that reflected an initial cash investment of $58,500. Although it is understandable that Chad might not have remembered the exact amount of money he had invested several years earlier, there was a substantial difference between $25,000 and $58,500. Further, the jury was free to believe or disbelieve Chad's testimony. While the documentation kept by Apostelos supported at least some initial cash investment made by Chad, this documentation was created by an operator of a Ponzi scheme. Assuming the jury discredited that unauthenticated documentation, only Chad's changing testimony remained. Given the record before us, we cannot conclude that the jury's decision to not credit Chad with any initial cash investment was against the manifest weight of the evidence.

{¶ 123} The fifth assignment of error is overruled.

VI. Conclusion

{¶ 124} The judgment will be reversed to the extent that it entered judgment in favor of Plaintiffs the Estate of Rafael M. Cruz, Sr., Gloria Cruz, Joseph Mullane, Carolyn Hedderly f.k.a. Harvey, Kristen Harvey, the Estate of Steve Harvey, John Riccobono, Rebecca Riccobono, and Andrew White against Defendants-Appellants Chad Leopard, Joe Leopard, and Joe's Landscaping of Beavercreek, Inc., and the matter will be

remanded for further proceedings with respect to those Plaintiffs.  In all other respects, the judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


TUCKER, P. J. and WELBAUM, J., concur.